[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-11159

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CHARIS MAPSON,
TIERZAH MAPSON,
ELISA MAPSON,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 6:19-cr-00433-LSC-SGC-3

_____

Before JORDAN and LAGOA, Circuit Judges, and CANNON,* District Judge.

JORDAN, Circuit Judge:

Tierzah Mapson and her two sisters, Charis Mapson and Elisa Mapson, appeal their convictions on charges stemming from the shooting of Joshua Thornton—the father of Tierzah's daughter. According to the government's theory at trial, the incident involved an elaborate plot hatched by the three Mapson sisters to kill Mr. Thornton over a child custody dispute. Luckily for the Thorntons, the Mapson sisters were unsuccessful.[1]

**I**

The government charged the three sisters with two counts of interstate domestic violence, in violation 18 U.S.C. § 2261(a)(1)–(a)(2) (Counts Two and Three, respectively); two counts of interstate stalking, in violation of § 2261A(1)–(2) (Counts Four and Five, respectively); one count of possessing and discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Six); and one count of conspiring to commit Counts Two through Six, in violation of 18 U.S.C. § 371 (Count One). The first trial ended in a mistrial.

At the second trial, the jury convicted Tierzah on Counts One through Five, and Charis and Elisa on Counts One, Four, and

---

* Honorable Aileen M. Cannon, United States District Judge for the Southern District of Florida, sitting by designation.

[1] For clarity, we refer to each sister by her first name in the opinion.

Five.  The district court sentenced Tierzah to 60 months' imprisonment, and Charis and Elisa each to 120 months' imprisonment.

## II

Tierzah, Charis, and Elisa each argue that the evidence was insufficient to support the jury's verdicts.  Charis and Elisa also raise several evidentiary challenges.  Specifically, Charis asserts that the district court plainly erred when it admitted testimony by her former partner that she once said that she owned an AR rifle.  She argues that the statement was prejudicial hearsay and thus inadmissible under Federal Rule of Evidence 801(c).  Elisa, joined by Charis, contends that the data obtained by the authorities from automated license plate readers (ALPRs) was inadmissible.  They argue that (1) the government's use of the ALPR databases constituted a warrantless search in violation of their Fourth Amendment rights in light of *Carpenter v. United States*, 585 U.S. 296 (2018); and (2) the evidence was otherwise inadmissible because the witness who testified about the ALPR data was not a qualified expert under Federal Rule of Evidence 702.

After review of the record, and with the benefit of oral argument, we affirm the convictions of Tierzah, Charis, and Elisa.

## III

We recount the relevant facts and the evidence in the light most favorable to the jury's verdicts.  *See Musacchio v. United States*, 577 U.S. 237, 243 (2016); *United States v. Ifediba*, 46 F.4th 1225, 1231 n.2 (11th Cir. 2022).

## A

We begin with some background on the Mapson sisters' connection to Mr. Thornton. Charis introduced Tierzah to Mr. Thornton in early 2012. Mr. Thornton was serving in the Marine Corps and was stationed in North Carolina along with Charis' husband at the time.

Charis herself was a former Marine. She was an ammunition technician specialist and had trained snipers. As a Marine, Charis had to annually pass an accuracy test—at distances as far as 500 yards—with an M-16, the military equivalent of the civilian AR-15 rifle.

Soon after their introduction, Tierzah and Mr. Thornton began a romantic relationship and Tierzah eventually became pregnant. A few months after their daughter's birth, Mr. Thornton and Tierzah got into an argument, and Tierzah stopped responding to Mr. Thornton's messages. When Mr. Thornton drove to her home a few days later, he found that she and her family were no longer living there. He later learned that they had moved to Tulsa, Oklahoma. This led Mr. Thornton to petition for full custody of their daughter or, in the alternative, for visitations with her.

Tierzah and Mr. Thornton eventually entered into a custody agreement whereby Tierzah had primary custody, and Mr. Thornton was given a total of six weeks of visitation per year. Generally, and while the visits were supervised, Elisa would drive Tierzah and the child from Oklahoma to Mr. Thornton's home in Florida. Tierzah and the child would stay in a guest room for the length

22-11159                Opinion of the Court                        5

of the visitation period.  Each visitation period would typically last up to four weeks.

Mr. Thornton was scheduled to meet with Tierzah on June 18, 2018, for his first unsupervised visit with his daughter.  The events of that day led to the charges against the Mapson sisters.

**B**

On June 17, 2018, Mr. Thornton sent an email to Tierzah and proposed that they meet for the visitation exchange the following day at a gas station in Jasper, Alabama.  He suggested that location because "[i]t was close to halfway between [himself] and Tierzah[.]"  D.E. 169 at 46.  Mr. Thornton described it as being in a "very public area."  *Id*.  A few hours later, Tierzah sent him a text message proposing another meeting place.  She requested that they meet at Pure Gas Station, also known as Barbara Ann's Place, in Eldridge, Alabama.  An investigating officer described that place as being in the "middle of nowhere."  D.E. 170 at 364.  Though the location was farther for him, Mr. Thornton agreed.[2]

Before sunrise on June 18, Mr. Thornton and his wife left their home in Winter Park, Florida, and began their journey to Barbara Ann's Place.  Throughout their trip, Mrs. Thornton texted Tierzah, updating her on their journey.  She also inquired about Tierzah's status, but Tierzah did not respond.

---

[2] On June 17, there were ten contacts between Tierzah's cell phone and Elisa's cell phone.

At around 1:00 p.m. (CDT), and after a 10-hour drive, the Thorntons arrived at Barbara Ann's Place. Mr. Thornton texted Tierzah at 1:44 p.m., letting her know that they had arrived and asking how far away she was. At 3:02 p.m., Tierzah responded: "I ran into traffic and will be running a few hours late. Right now it looks like maybe an hour & half or so." D.E. 148-2 at 3. Mr. Thornton replied, and asked Tierzah to "[p]lease keep [them] updated as soon as [she] kn[e]w for sure when [she] will be [t]here, or if [she was] going to be even later . . . . " Id.

The Thorntons continued to wait for Tierzah in their car while parked at Barbara Ann's Place. Another two hours passed, and Mr. Thornton still had not heard from Tierzah. He again texted her, asking about her whereabouts at 5:13 p.m. A couple of minutes later, she responded that it would be "a little while longer" because the child had gotten "car sick and puked." Id. at 5.

While still waiting for Tierzah to arrive as promised, Mr. Thornton sat in the driver's seat and phoned his father. As the two were speaking, Mr. Thornton suddenly heard what he first assumed were "fireworks going off." But when he turned around to see what was happening behind him, he realized he had been shot in the arm. One of the bullets had entered through the rear of the vehicle near the trunk, passed through the back seat, and then gone through the driver's seat.

Mr. Thornton instinctively opened the car door in an attempt to run to safety, but immediately closed it when he heard another round of shots being fired. He tried a second time to leave

his car, this time making it safely inside the convenience store as more shots were fired. The store manager called an ambulance, and Mr. Thornton was rushed to a nearby hospital.

The shooting happened at around 5:40 p.m. While on the way to the hospital, Mrs. Thornton used her husband's phone to message Tierzah (at 6:37 p.m.) that the "meeting place ha[d] changed due to a minor emergency" and that they would meet instead at the hospital. Tierzah responded fifteen minutes later: "I'm sorry. Turns out we drove past [the exit] since my sister is so use[d] to driving all the way to FL." She proposed that they "just meet in FL as usual." Mrs. Thornton did not tell Tierzah at that time that Mr. Thornton had been shot.

Tierzah then called Mr. Thornton's phone and spoke to Mrs. Thornton. She sounded "freaked out" and explained to Mrs. Thornton that she could not meet them at the hospital because "they were almost to Florida." Mrs. Thornton remarked that they could not possibly be close to Florida given that, in her last text message, Tierzah had indicated that they had not yet made it to Eldridge, Alabama.

Mr. Thornton's mother, Rebecca Hankinson, had been keeping in contact with the Thorntons while they waited for Tierzah to arrive at Barbara Ann's Place. She also attempted to contact Tierzah several times throughout the day to inquire about her arrival time. Tierzah, however, provided her with the same responses that she had given Mr. Thornton: she was running late due to traffic and the child getting carsick.

Upon learning about her son's shooting, Ms. Hankinson called and texted Tierzah multiple times asking that she call back because there had been an emergency. Tierzah responded, asking "what emergency?" Ms. Hankinson replied that Mr. Thornton had been shot. Tierzah then called Ms. Hankinson and seemed to be "freaking out" about the shooting, though Ms. Hankinson did not believe her concern to be genuine.

As it turned out, Tierzah had never been on her way to Barbara Ann's Place. The entire time she had been texting Mr. Thornton from a campground in Florida, where she had been staying with her sister Elisa for the last month.

On June 18, Tierzah contacted her sisters, Elisa and Charis, several times. Cell phone towers in the area pinned Charis' and Elisa's phones in Eldridge around the time of the shooting, though neither sister lived in Alabama. On the morning of the shooting, Elisa sent a text to Charis providing the address to Barbara Ann's Place and a note reading "it's just Halo"—a reference to a first-person shooter videogame. ALPRs also captured Elisa's vehicle in Georgia and Alabama on the same day.

## C

The next day, June 19, Mr. Thornton and his wife returned to their home in Florida. When they arrived, Mr. Thornton contacted Tierzah and requested that she and the child go to his apartment to begin the visitation.

That evening, Tierzah and Elisa met with Mr. Thornton and said that they would not allow him to have unsupervised visitation

with the child because Tierzah believed that he was involved in "gang violence." Later that night, they offered to allow him to visit his daughter in a nearby hotel in Orlando where they would be staying for two weeks. By this point, the authorities were investigating the shooting.

## D

Immediately after the shooting, police officers arrived at Barbara Ann's Place to investigate. An officer with the Walker County Sheriff's Office determined that the shots had been fired from a long distance, similar to "a sniper type attack." Given the trajectory of the bullets, only two locations across the intersection seemed likely. One was an abandoned produce stand, but there was no evidence that anyone had recently been there. The second was a hill behind a church that was diagonally across from the gas station. When officers examined the hill area by the church, they noticed evidence suggesting that someone may have recently slipped or fallen there.

Video surveillance from Barbara Ann's Place showed a white pickup truck park near the church roughly an hour before the shooting. The truck left shortly after Mr. Thornton ran inside the store. Elisa drove a similar pickup truck.

Officers also found bullet fragments at the scene. Though the precise caliber of the bullets could not be determined, the measurements of the fragments suggested that the bullets could have been fired from several types of firearms, including a .38 Special and a .233 caliber firearm (i.e., an AR-style rifle). Surveillance

footage from Barbara Ann's Place and forensic evidence on the bullet trajectories—including the accuracy of the shot and the fact that the shooter was believed to have been about 200 yards away from Mr. Thornton's parked vehicle—suggested the weapon was an AR-style rifle. Officers also noticed that the area by the church had a tree which could have offered the shooter a stable position from which to fire.

Two days after the shooting, Tierzah had the following letter notarized:

> I truly without a doubt fear for my life and my daughter's life. I am in fear of Joshua Thornton and Tabitha Thornton poisoning us to death or kidnapping us to traffic. I also fear they work with drugs illegally. This is my solid testimony if anything should ever happen to myself, Tierzah Mapson, and/or my daughter, [ ] Mapson.

D.E. 170 at 375–76.[3]

### E

On June 22, several days after the shooting, officers interviewed Tierzah and Elisa.

Tierzah initially denied knowing anything about the incident. But once an officer told her that Mr. Thornton had been shot, she appeared to have already known that fact (recall her June 18

---

[3] Tierzah had previously—and unsuccessfully—sought a restraining order against Mr. Thornton for allegedly abusing her and molesting her niece.

22-11159               Opinion of the Court                11

conversation with Ms. Hankinson) and blamed the incident on a gang.[4]

Tierzah said she had driven from Oklahoma to a resort in Daytona Beach on the day of the shooting. According to Tierzah, she and Elisa were at the resort together, although on separate parts of the property, thus explaining the numerous phone calls between the two.

When an officer asked why the pickup truck was tracked driving to Alabama from Florida that same day, Tierzah said a stalker took the vehicle to meet Mr. Thornton. This person had apparently stalked her for several years and threatened her family, although she had never told anyone. Tierzah and the stalker only communicated in person, and the stalker usually wore a mask. Tierzah could not explain how the stalker would have known where to meet Mr. Thornton considering they did not communicate over the phone. Tierzah also claimed that Mr. Thornton was not the father of her child.[5]

Elisa gave officers two differing accounts of her whereabouts on June 18. She initially said that she and Charis were on their way to meet Mr. Thornton at the gas station in Eldridge, but missed a turn. Upon realizing their mistake, they asked Mr.

---

[4] An FBI agent in the Violent Crimes and Gang Squad testified that there are no gangs in the vicinity of Eldridge, Alabama. *See* D.E. 158 at 201.

[5] Mr. Thornton testified that, during their prior custody dispute, he was determined to be the father of the child pursuant to a paternity test.

Thornton to meet them in Florida instead.  After being told that lying to a federal agent is a crime, Elisa provided a second version of events.  This time, Elisa said that a friend, Jack Winfield, borrowed her truck to go shoot Mr. Thornton because he had allegedly abused Tierzah.  Nevertheless, Elisa blamed the shooting on gangs in Alabama.[6]

Mr. Winfield knew where to go, Elisa said, because she communicated with him by phone.  But when told that her phone's location would eventually be tracked, Elisa said that she left her phone in the truck with Mr. Winfield.

A search of Elisa's truck revealed wig caps, gloves, earplugs, and a handgun.  On the morning of the shooting, Elisa purchased two pairs of binoculars.

Elisa believed that Mr. Thornton was not the father of Tierzah's child.  She accused him of threatening to sell the child into "sex slavery."

Officers interviewed Charis close to a year after the shooting.  Charis said she was at work in Oklahoma during the shooting.  But her work schedule had her off from June 16 to 18.  She denied giving her phone to anyone who went to Alabama.

---

[6] Law enforcement officers did not find anyone named Jack Winfield who fit Elisa's description.

### F

At trial, the government's theory of the case was that Tierzah conspired with her two sisters to kill Mr. Thornton to keep him from unsupervised visits with his daughter. As part of the scheme, they lured Mr. Thornton to a gas station in Eldridge, Alabama, on the false promise that Tierzah would bring their daughter there so that he could begin a period of unsupervised visitation with her.

Charis and Elisa defended on the theory that they were not involved. Tierzah asserted that there was insufficient evidence to prove that she knew her sisters were going to commit an act of violence against Mr. Thornton. The jury largely sided with the government, convicting the sisters on several charges.

### IV

We first address Charis' argument that the district court erred by allowing inadmissible hearsay testimony. We review for plain error because Charis did not preserve her objection in the district court. *See United States v. Russell*, 957 F.3d 1249, 1252 (11th Cir. 2020).

On direct examination of Michael Wieberg—Charis' former co-worker and the father of one of her children—the government asked him whether Charis had ever told him that she owned a firearm. He answered that once, when they and some of their co-workers were commuting to work, the topic of guns came up and Charis stated that she owned "an AR." D.E. 171 at 484. Charis argues that this statement from Mr. Weiberg—that she at one point

said she owned an AR rifle—constituted inadmissible hearsay and "was far more prejudicial than probative." We disagree.

First, there was no error, plain or otherwise. Under Federal Rule of Evidence 801(d)(2)(A), "a statement is not hearsay" and is admissible as an admission by a party opponent "if it is the statement of the party against whom it is offered." *United States v. Munoz*, 16 F.3d 1116, 1120 (11th Cir. 1994). Here, the statement at issue was both made by Charis and offered against her. The statement was thus admissible under Rule 801(d)(2)(A) as a non-hearsay admission by a party opponent. *See United States v. Williams*, 837 F.2d 1009, 1013 (11th Cir. 1988) (stating that "admissions of a party opponent may be introduced as nonhearsay"); *United States v. Dukagjini*, 326 F.3d 45, 62–63 (2d Cir. 2003) (finding witness' testimony that the defendant had told him about his possession of a firearm was admissible against the defendant as an admission by a party opponent).

Second, under plain error review, we cannot say that any risk of "unfair prejudice" substantially outweighed the statement's probative value. *See* Fed. R. Evid. 403. Charis' statement that she owned a firearm like the one thought to have been involved in the shooting of Mr. Thornton was highly probative. It pointed to Charis—a former Marine who had trained as an ammunition specialist and had to annually pass a long-distance accuracy test with the military-equivalent rifle—as the shooter. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant

evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

## V

We next address Elisa's and Charis' evidentiary challenges regarding the ALPR evidence introduced at trial. That evidence generally consisted of reports from online databases showing that ALPRs captured a license plate matching the one on Elisa's vehicle traveling in Alabama (and elsewhere) at suspiciously coincidental times and locations in relation to the shooting.

### A

Before the first trial—which ended in a mistrial—Elisa filed a motion *in limine* to exclude all ALPR evidence concerning the geographical movements of her vehicle on the day of the shooting. As relevant here, she argued that the evidence should be excluded because the government's use of the ALPR databases constituted an unconstitutional warrantless search under the Fourth Amendment. Alternatively, she argued that the district court should require that the government introduce the evidence through an expert witness.

The district court overruled the motion at the first trial. It concluded that Elisa did not have an expectation of privacy as to her tag or the exterior of her vehicle—the things that were visually captured through the ALPR system. It also concluded that the evidence did not require expert testimony because showing a photograph or image of a vehicle and a tag was no different than a

photograph or video evidence of a person committing a crime that could be introduced at trial without expert testimony.

At the second trial, the government again sought to introduce the ALPR evidence through the officer who had obtained the reports. Elisa renewed her objections, and Tierzah and Charis adopted those objections. The district court overruled the objections on the same grounds.

## B

The government introduced the ALPR evidence through Lieutenant Ted Davis of the Hoover Police Department. He testified that ALPRs are camera systems that capture still photographs of the license plate numbers of vehicles traveling on the road. The cameras can be mounted on top of police cars or on traffic poles. He explained that the information is maintained by private companies and that entities subscribed to their databases (like police departments) can look up cars by make and model or license plate number and determine which vehicles traveled on a particular road at a certain time.

In this case, Lieutenant Davis obtained ALPR reports that were created by two third-party companies, Vigilant and ELSAG, concerning Elisa's vehicle. The reports showed Elisa's license plate number at three locations on the day of the shooting: (1) Interstate 75 northbound in Dooly County, Georgia, at 9:53 a.m. (EDT); (2) I-20 westbound, in Carroll County, Georgia, at 12:55 p.m. (EDT); and (3) I-20 eastbound in Leeds, Alabama, at 7:57 p.m. (CDT). The reports therefore seemed to indicate that Elisa's vehicle traveled in

the direction of Barbara Ann's Place before the shooting and away from it after the shooting.

Elisa and Charis argue that the ALPR evidence was not admissible because the acquisition of the data was an unconstitutional search and because Lieutenant Davis was not a qualified expert witness. We address these arguments in turn.

## C

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . . " U.S. Const. amend. IV. Save for some exceptions not relevant here (e.g., exigent circumstances), a warrantless "search" under the Fourth Amendment is per se unreasonable. *See United States v. Steed*, 548 F.3d 961, 967 (11th Cir. 2008) (per curiam).

In 2018, the Supreme Court held that the government's acquisition of a person's historical cell-site location information constitutes a search under the Fourth Amendment and therefore requires a warrant. *See Carpenter*, 585 U.S. at 316–17. Charis and Elisa argue that the ALPR data obtained in this case is akin to cell-site location information and that, as a result, *Carpenter* required the government to obtain a warrant before accessing the ALPR databases. We need not decide whether *Carpenter* requires a search

warrant for ALPR data because the good-faith exception to the exclusionary rule applies.[7]

The Supreme Court has held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Davis v. United States*, 564 U.S. 229, 241 (2011). *Carpenter* was decided on June 22, 2018—fortuitously the day *after* the ALPR inquiries on Elisa's vehicle were conducted by Lieutenant Davis. *See* D.E. 170 at 279–80. At the time the government accessed the ALPR databases, the binding precedent in this Circuit authorized an officer to obtain a person's cell-site location data without a warrant. *See United States v. Davis*, 785 F.3d 498, 513 (11th Cir. 2015) (en banc), *abrogated by Carpenter*, 585 U.S. at 316–17. We did not have any cases addressing the constitutionality of warrantless acquisition of ALPR data, and neither did the Alabama Supreme Court. It was therefore reasonable for an officer like Lieutenant Davis to rely on this Court's en banc precedent in *Davis* providing that the government could obtain historical location data—here, ALPR information concerning the location of

---

[7] There is very little in the caselaw and academic literature about whether the acquisition of ALPR data constitutes a Fourth Amendment search that requires a warrant. *See, e.g., United States v. Yang*, 958 F.3d 851, 861 (9th Cir. 2020) (refusing to decide the question because the defendant did not have a reasonable expectation of privacy in an overdue rental car); Yash Dattani, *Big Brother Is Scanning: The Widespread Implementation of ALPR Technology in America's Police Forces*, 24 Vand. J. Ent. & Tech. L. 749, 767 (2022) ("Both Supreme Court and lower court rulings have failed to directly address ALPR technology and whether aggregation of one's public travels implicates Fourth Amendment rights.").

Elisa's vehicle—without a warrant. *See United States v. Joyner*, 899 F.3d 1199, 1204–05 (11th Cir. 2018) (per curiam) (applying the good-faith exception to the exclusionary rule where the government obtained cell-site records without a warrant before *Carpenter*); *United States v. Green*, 981 F.3d 945, 956–57 (11th Cir. 2020) (same).

## D

Elisa and Charis make an alternative argument challenging the admissibility of the ALPR evidence under Federal Rule of Evidence 702. We review this argument for abuse of discretion. *See United States v. Estrada*, 969 F.3d 1245, 1270 (11th Cir. 2020).

According to Elisa and Charis, the district court abused its discretion in admitting the ALPR evidence because the government did not qualify Lieutenant Davis as an expert. They argue that his testimony required technical and specialized knowledge within the scope of Rule 702. We are unpersuaded.

Under Federal Rule of Evidence 701, a lay witness may offer opinion testimony if the testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701 "does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." *United States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017) (internal quotation marks omitted).

We agree with the government that the testimony here regarding ALPR data did not require expertise or specialized

20                    Opinion of the Court                    22-11159

knowledge beyond that of a lay person.  The ALPR reports simply contained pictures of Elisa's tag and vehicle as captured by the ALPR systems.  Lieutenant Davis generally explained that an ALPR is a "system that takes pictures of vehicle tags, [ ] recognizes the characters that are on the license plates[,] and takes basically a still photo of that car tag . . . ."  D.E. 170 at 267.  He also emphasized that "it's just a camera taking pictures."  *Id.* at 268.  He discussed retrieving the ALPR data from the electronic databases of Vigilant and ELSAG and explained that he did so by inputting a vehicle's make, model, year, or tag number into those databases.  *See id.* at 270–71.  Having worked with ALPR systems for twelve years, the district court could have fairly concluded that Lieutenant Davis gained his knowledge from his own personal experiences and not from any "scientific, technical, or other specialized knowledge." *Jeri*, 869 F.3d at 1265.

Elisa and Charis fail to point to any part of Lieutenant Davis' testimony that was "technical" or "specialized."  Instead, they generally argue that the functionality and reliability of the ALPR databases requires "expertise and specialized knowledge beyond that of a common person."  *See* Elisa's Br. at 50.  Lieutenant Davis, however, did not provide such technical or specialized information.  He stated—from his own experience—that the ALPR systems are not always "a hundred percent . . . accurate." *See* D.E. 170 at 268–69. But he also opined that they are generally reliable and dependable. *See id.* at 276.  This testimony, contrary to the contention of Elisa and Charis, did not "impermissibly cross[ ] over the line into expert testimony."  *United States v. Chalker*, 966 F.3d 1177, 1192 (11th Cir.

2020).  *See, e.g., Tampa Bay Shipbuilding & Repair Co. v. Cedar Ship. Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003) (holding that opinion of company employees on the reasonableness of fees charged to a customer did not constitute expert testimony because it was "based upon their particularized knowledge garnered from years of experience within the field").

We conclude that the district court did not abuse its discretion in allowing the ALPR evidence and related testimony without the government qualifying Lieutenant Davis as an expert.

## VI

We next address the Mapson sisters' challenges to the sufficiency of the evidence.  We review sufficiency challenges *de novo*, viewing the evidence, and all reasonable inferences therefrom, in the light most favorable to the jury's verdicts. *United States v. Dixon*, 901 F.3d 1322, 1335 (11th Cir. 2018).  The question is whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Musacchio*, 577 U.S. at 243.  "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989).

"Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and collocation of circumstances." *Glasser v. United States*, 315 U.S. 60, 80 (1942) (citation and internal quotation marks omitted).  Circumstantial evidence can also be sufficient to

establish guilt beyond a reasonable doubt on substantive charges. *See Holland v. United States*, 348 U.S. 121, 137–38 (1954). "But '[w]hen the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction.'" *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (quoting *United States v. Mendez,* 528 F.3d 811, 814 (11th Cir. 2008)).

We begin with Charis, move on to Elisa, and end with Tierzah.

**A**

The jury convicted Charis on Count One, conspiring to violate the interstate stalking statute, 18 U.S.C. § 2261A(1)–(2), with an object of the conspiracy being the discharge of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c); Count Four, violating 18 U.S.C. § 2261A(1), with a special finding that she used a dangerous weapon during the offense; and Count Five, violating 18 U.S.C. § 2261(A)(2), with the same special finding. Charis was the only defendant whom the jury found conspired to discharge a firearm under Count One and used a dangerous weapon under Counts Four and Five.[8]

Charis argues only that the evidence was insufficient for the jury to conclude that she was the shooter and contends that this failure of proof dooms all of her convictions. At bottom, Charis argues that the jury did not have enough   evidence to choose

---

[8] We do not set out the elements of the offenses Charis was convicted of due to the narrow sufficiency claim that she makes on appeal.

between her and Elisa as the shooter.  We disagree.  In our view, the government presented enough circumstantial evidence for the jury to conclude beyond a reasonable doubt that Charis did in fact pull the trigger.

Based on the trajectory of the bullets, the video footage, the surrounding landscape, and the signs of human presence on the hill, the government established that the shooter was by the church across the street from Barbara Ann's Place.  That would have made it a roughly 200-yard shot.  Of the two sisters placed at the scene of the crime, Charis—a former Marine who was an ammunition specialist and who was required to accurately shoot a military-equivalent rifle from 500 yards—had the ability to make that shot.

Mr. Weiberg testified that Charis said that she once owned "an AR [rifle]" and that she had previously "trained snipers" in the Marines.  An AR rifle was the same type of weapon that Chris Robinson—Tierzah's own ballistic expert—testified was likely used to shoot Mr. Thornton.  That conclusion was also consistent with the opinion of the FBI's ballistic expert, Derrick McClarin.  And there was additional evidence that Charis owned an AR-type rifle.  A month before the shooting, she went to a firing range and purchased tools to make modifications to an AR-type rifle.  *See* D.E. 171 at 610–12.

The jury could have also viewed Charis' false statements to the authorities as an attempt to cover up her involvement in the shooting.  *See United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir. 1984) ("A false explanatory statement may be viewed by a jury as

substantive evidence tending to prove guilt.").  Contrary to the statements Charis made at the FBI interview, cell-tower data placed her phone in Eldridge the night before the shooting, and her work schedule had her off from June 16 to 18.  On the morning of the shooting, moreover, Elisa texted Charis the address to Barbara Ann's Place and a message that "it's just Halo"—a reference to a first-person shooter videogame.  That text could have fairly been viewed by the jury as Elisa encouraging Charis to shoot Mr. Thornton.

Given all of this evidence, we conclude that the jury could have reasonably found beyond a reasonable doubt that Charis was the shooter.  As Charis does not make any other sufficiency arguments, we affirm her conviction.

**B**

The jury convicted Elisa on Count One, conspiring to violate the interstate stalking statute, 18 U.S.C. § 2261A(1)–(2); Count Four, violating § 2261A(1); and Count Five, violating § 2261A(2).

Like Charis, Elisa makes a very narrow sufficiency argument.  She contends only that there was insufficient evidence for the jury to find beyond a reasonable doubt that she—not just her truck or her cell phone—was in the vicinity of Barbara Ann's Place at the time of the shooting.  In her view, the jury could conclude that she was at the scene of the shooting only through impermissible speculation.  Elisa frames her presence at the scene as being necessary for the government to sustain all three of her convictions.

We conclude that the jury could reasonably find beyond a reasonable doubt that Elisa was at the scene of the shooting. First, Elisa's truck was captured on the ALPR data, and a similar vehicle was seen near the hill by Barbara Ann's Place before and after the shooting. And when searched by the authorities four days later, that truck contained a suspicious array of items: wig caps, gloves, earplugs, and a handgun. Second, on the morning of the shooting, Elisa purchased two pairs of binoculars and—as noted earlier—texted Charis the address of Barbara Ann's Place along with the message "it's just Halo." Third, Elisa herself told the authorities that she had been with Charis on the day of the shooting. Although, as explained below, the jury could have disbelieved some of her statements to the authorities, it could have found this particular statement truthful and accurate. *See Digsby v. McNeil*, 627 F.3d 823, 832 (11th Cir. 2010) ("It is well-established that a jury may believe a witness'[ ] testimony in whole or in part."). Fourth, the jury could reasonably find that Elisa was motivated to harm Mr. Thornton and was at the scene given her allegations that he was not the child's father and that he threatened to sell the child into "sex slavery." In sum, the jury could have reasonably found beyond a reasonable doubt that Elisa was at the scene of the shooting.

As with Charis, the jury also could have reasonably viewed Elisa's shifting narratives to the authorities as attempts to cover up her personal involvement in the shooting. *See Eley*, 723 F.2d at 1525. At first, Elisa told officers that she and Charis were on their way to meet Mr. Thornton at the gas station in Eldridge but missed a turn. It was not until after an officer informed Elisa that lying to a federal

agent is a crime that she provided the Jack Winfield story (which the authorities could not confirm). Elisa's statements also differed from Tierzah's stalker explanation, further indicating the two were hiding something and were not being truthful. That something, the jury could reasonably infer, was their dual involvement in the shooting. *See United States v. Perez*, 698 F.2d 1168, 1170–71 (11th Cir. 1983) (noting that inconsistent exculpatory statements may be a "surrounding circumstance[ ]" which "supply inferences of knowledge [and] adequately prove intent") (citation and internal quotation marks omitted).

## C

The jury convicted Tierzah on five charges: two counts of interstate domestic violence, in violation 18 U.S.C. § 2261(a)(1)–(a)(2) (Counts Two and Three, respectively); two counts of interstate stalking, in violation of § 2261A(1)–(2) (Counts Four and Five, respectively); and one count of conspiring to commit Counts Two through Five, in violation of § 371 (Count One).

Tierzah contends that the most the jury could find was that she "expected Elisa to confront Mr. Thornton with an excuse or argument to obstruct his visitation with the child." Tierzah's Br. at 34. But to convict her, Tierzah argues—and the government agrees—the government had to prove she knew her sisters intended the use of or threat of violence against Mr. Thornton. Tierzah concedes that the government presented sufficient evidence to establish her sisters' violent intent, but not hers. The sufficiency

issue is closer than with Charis and Elisa, but at the end of the day, we disagree with Tierzah.

There are at least four categories of facts, taken together and viewed in the light most favorable to the government, from which the jury could have inferred Tierzah's knowledge of her sisters' violent intent beyond a reasonable doubt. We set these out below.

First, there is motive. "[Although] motive is not an element of any offenses charged against [a defendant], it may be evidence of identity or of deliberateness, malice or specific intent which are elements of the crimes." *United States v. Benton*, 637 F.2d 1052, 1056 (5th Cir. 1981). *See also United States v. Melgen*, 967 F.3d 1250, 1263 (11th Cir. 2020) (identifying defendant's motive as relevant to the sufficiency of the evidence). *Cf.* John Locke, *Some Thoughts Concerning Education* § 54 (1693) ("Good and evil, reward and punishment, are the only motives to a rational creature[.]").

Mr. Thornton testified that, before the shooting, Tierzah unsuccessfully sought a restraining order against him for allegedly abusing her and molesting her niece. In so doing, Tierzah claimed she feared for her life and her family's well-being. After the shooting, Tierzah made similar accusations in her notarized letter. Tierzah also told officers that she did not think Mr. Thornton was the father of her child. The jury could have found that Tierzah was not just interested in creating an elaborate plan to deny Mr. Thornton unsupervised visitation in June of 2018, but that she was motivated to harm or kill him to avoid further contact with him and to prevent any visitation with their daughter.

Second, there are the communications.  Tierzah was in constant communication with her sisters the day before the shooting and the day of the shooting.  Phone records presented at trial showed that Tierzah's phone contacted (including failed attempts) Elisa's phone 10 times the day before the shooting and the phones of Elisa and Charis 68 and 21 times, respectively the day of the shooting.  The jury could have viewed that level of communication as evidence of Tierzah's knowledge of, and involvement in, the overall violent scheme.  Tierzah also communicated with Mr. Thornton (and lied to him about her whereabouts) on the day of the shooting so as to make him remain near Barbara Ann's Place for hours.  The jury could have seen Tierzah's actions as providing assistance to Elisa and Charis as they prepared to shoot Mr. Thornton.  *See United States v. Doston*, 570 F.3d 1067, 1068–69 (8th Cir. 2009) ("Evidence that a co-conspirator participated in acts that furthered the conspiracy is substantive evidence of the conspiracy's existence.").

Third, there is the evidence of Tierzah's false statements to the authorities.  *See Eley*, 723 F.2d 1525.  Tierzah, perhaps distinguishably so, provided elaborate and shifting statements to the authorities on which the jury could have relied to infer her advance knowledge of her sisters' violent actions.  To recap, Tierzah initially denied knowledge of the shooting even though Ms. Hankinson told her about it the same day.  Tierzah and Elisa were supposedly at a resort in Daytona Beach during the shooting even though there are numerous phone calls between the two and cell-tower data placed Tierzah at a campground in Florida.  Tierzah said that she

drove from Oklahoma to Florida on the day of the shooting, but when confronted on why Elisa's pickup truck was tracked driving from Florida to Alabama, she said that an unnamed stalker—whom nobody but Tierzah had ever heard of before—took the vehicle and drove to shoot Mr. Thornton. We have explained that a jury can consider a defendant's shifting and inconsistent exculpatory statements in determining intent, and that is the case here. *See Perez*, 698 F.2d at 1170–71. *See also United States v. Anderson*, 783 F.3d 727, 750 (8th Cir. 2015) (explaining that "a reasonable jury is entitled to disbelieve" the defendant's "shifting explanations" to law enforcement and "infer consciousness of guilt").

And fourth, there is common sense, which the jury was told that it could use in evaluating the evidence. *See* D.E. at 146 at 4. *See also United States v. Anderson*, 747 F.3d 51, 70 (2d Cir. 2014) ("[A]lthough the government is not permitted to build a conviction on a house of cards, neither is a jury required to leave its common sense at the courthouse door."). It is a lot to ask of a jury to believe that Tierzah traveled from Oklahoma to Florida—arriving in Florida weeks earlier—only to lure Mr. Thornton to a remote location in Alabama of her choosing where her sisters would peacefully "obstruct" the scheduled unsupervised visitation. Why would that have required meeting at an obscure spot hours away from Mr. Thornton's (and Tierzah's) locations? A common-sense inference is that it did not. Drawing all reasonable inferences in favor of the government based on the aggregate evidence presented, the jury could have viewed the incredible nature of these circumstances as evidence that Tierzah knew of and agreed to the plan to harm Mr.

Thornton. *Cf. United States v. Leichman*, 742 F.2d 598, 602–03 (11th Cir. 1984) (rejecting argument by the defendants that they did not know that kidnapping was the objective of the charged conspiracy, and at most believed that the objective was false imprisonment).

## VII

We affirm the convictions of Tierzah, Charis, and Elisa.

**AFFIRMED.**