**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 23-13642

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

ANTHONY RONDEL BLAIR,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cr-00260-LMM-CMS-1

————————————————

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

Anthony Blair had quite the deal for his friends and associates: all-expenses-paid vacations to Costa Rica. The only catch? They would have to bring back "souvenirs" in their luggage—things like stuffed animals, coffee, and, most

importantly, canned fruits and vegetables.   When the travelers returned, Blair would meet them and collect just the cans (the rest was theirs to keep).

The cans, as the reader may have suspected, contained neither fruit nor vegetables, but cocaine.   The government eventually caught on, too, and charged Blair with conspiring to distribute a controlled substance.   At trial, he argued that the government had not proved that he knew the cans contained cocaine, but the jury did not buy it.   Blair now brings six challenges to his trial and sentencing.   None are persuasive, and we affirm.

## I.

At least to Blair, it seemed like the perfect drug-smuggling scheme: find everyday people, provide them with all-expenses-paid vacations to Costa Rica, secretly give them drugs, and then send them home, unaware that they were carrying cocaine.   The travelers, for their part, were given certain "souvenirs," including canned goods, and were told they were part of an insurance company's security audit of baggage handling practices.   The travelers sometimes doubted the insurance story, but only a handful refused to play along.   Because they looked like tourists returning from vacation, getting through customs was usually no trouble.   Then, the cans (but not the other "souvenirs") were retrieved—along with the cocaine inside them.

Blair learned about this scheme while working as a credit repair specialist for Jason Arias and other members of the Arias

family.    And when he discovered how much Arias made bringing the cans back from Central America, he wanted in.    Blair soon took a trip, brought back some cans, and made $2,500 after driving them "up north" to Arias's uncle.

His appetite whetted, Blair soon began recruiting other travelers, with a finder's fee that eventually reached $12,500 per pair.    Over the course of nine months, he booked ninety-four travelers.    Blair served as the travel agent for his recruits, paying for flights, hotels, and Ubers.    But that was not all: if a traveler needed an expedited passport, new luggage, cash to pay a traffic citation while abroad, or even spending money for nail appointments and other "upkeep," Blair covered that, too.    He also stayed in touch, ensuring that his recruits would be in their rooms when Arias came by to drop off the "souvenirs."

Things went well for Blair until he recruited Sequoia Quixote, a convicted felon, to take the trip.    Predictably enough, Quixote was screened at customs in the United States, where agents found the cocaine.    Quixote told them about Blair, and the plot quickly unraveled; Blair was arrested as soon as he arrived at the airport to pick up Quixote.

Agents easily unlocked his phone by guessing his passcode (proof that using one's birthday is not a foolproof strategy).    But they waited for a warrant before retrieving any data.    The next day, warrant in hand, the agents extracted data using a plug-and-play extraction tool called Cellebrite.    Technical issues marred the first extraction, so they waited for a Cellebrite software update

and tried again thirty days later after obtaining a new warrant. Meanwhile, after Blair was released on bond, he contacted Arias, who then paid a $50,000 retainer for his legal defense.

For reasons unknown, the government dropped the charges in March of 2018, but Blair had not learned his lesson: a few months later, agents caught yet another traveler with five cans of cocaine. She too agreed to cooperate, so when Blair stopped by around midnight to collect the cans, he was arrested. A series of superseding indictments ultimately culminated in a seven-count indictment covering cocaine importation, cocaine possession, and money laundering.

As the walls closed in, other members of the conspiracy flipped. Dan Newton, a repeat traveler and friend of Arias's, informed the government that Arias had paid for Blair's attorney, which led the police to take a closer look at Arias—who also became a cooperating witness. He told agents about his conversations with Blair, and admitted that he had paid for Blair's attorney. Arias already had a phone he used just for communicating with Blair, and he shared its contents with the government.

Arias eventually entered a formal plea deal with the government, contingent on his cooperation at Blair's trial (and otherwise). And when he repeated during a proffer session that he had paid for Blair's attorney, the government raised the conflict in a motion. Blair's counsel withdrew, a public defender stepped in, and Blair went to trial a year later.

At trial, Blair did not deny that he had made the travel arrangements or that he had transported the cans from Atlanta to New England.   Instead, he argued that he didn't know they had illegal contents.   In his closing argument, Blair said that he had been told the cocaine would not "test positive" and was "untraceable."   Arias, he insisted, had told him the cocaine was "not illegal."   He also argued that the cocaine in the cans had been "goop," not "powder white," so he should not have been expected to know it was cocaine because of the consistency.   Blair also claimed that he had seen neither the bricks of cocaine nor the blender and acetone used to put them into the cans.

The jury was not convinced.   It convicted Blair on six of the seven counts, and the judge sentenced him to twenty years' imprisonment.   He now appeals.

## II.

Blair raises Sixth Amendment claims, evidentiary claims, a claim that his subpoenas should not have been quashed, jury instruction claims, a due process claim, and substantive and procedural challenges to his sentence.   We reject them in turn.

## A.

We start with his two Sixth Amendment right-to-counsel claims, which we review de novo.   *United States v. Gari*, 572 F.3d 1352, 1361 (11th Cir. 2009).   Blair first raises a Sixth Amendment intrusion claim.   Such a claim can be successful when the defendant shows one of three things: (1) tainted evidence; (2) communication of the defense strategy to the prosecution; or

6                        Opinion of the Court                    23-13642

(3) purposeful intrusion by the government on the defendant's Sixth Amendment rights.   *United States v. Roper*, 874 F.2d 782, 790 (11th Cir. 1989).[1]   We do not see any of those here.

Blair's argument, we will confess, is not entirely clear.   But he seems to press the third option, contending that the government intruded on his attorney-client relationship by engaging Arias as a cooperating witness when it knew that Arias was also paying for his counsel.   But that's not enough.   Purposeful intrusion refers to intentional efforts to learn about a defendant's defense strategy. *Weatherford v. Bursey*, 429 U.S. 545, 557 (1977).   Here, the record offers no suggestion that Arias directed Blair's counsel's efforts or obtained any information about his defense strategy, much less that he shared that strategy with the government.   Moreover, Blair's first attorneys withdrew once the government notified the court that it wished to present evidence of the Arias payments, and Blair's new court-appointed counsel had adequate time to prepare for trial.   And again, there is no evidence that the government learned about, let alone influenced, Blair's trial strategy—or that it asked Arias to do so, or encouraged the payments, all of which were made before Arias had started talking with the government.

Contrary to Blair's assertion, telling the jury that Arias had paid for his first lawyers does not convert any of this into evidence of intrusion; it simply supports the government's assertions of a

---

[1]  If we find a constitutional error, we review it to see "whether it was harmless beyond a reasonable doubt."   *United States v. Roy*, 855 F.3d 1133, 1178 (11th Cir. 2017) (en banc) (quotation omitted).

conspiracy between the two.    "There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion," we see no violation of the Sixth Amendment.    *Id.* at 558.

Blair's second right-to-counsel claim is that the government interfered with that right by using Arias to collect incriminating information from him without his attorney present.    *See Massiah v. United States*, 377 U.S. 201, 205–06 (1964).    To succeed on this *Massiah* claim, Blair must show that Arias deliberately elicited incriminating statements from him while acting as a government agent.    *Baxter v. Thomas*, 45 F.3d 1501, 1510 (11th Cir. 1995).

No "bright line test" reveals whether someone is a government agent for purposes of the Sixth Amendment. *Lightbourne v. Dugger*, 829 F.2d 1012, 1020 (11th Cir. 1987) (quotation omitted).    But various factors are relevant: whether the government initiated contact, solicited the party to be a paid informant, encouraged "the elicitation of incriminating statements," or promised or suggested that the informant would be rewarded for reporting incriminating statements.    *Id.*    The "ultimate issue" is whether the facts show "the functional equivalent of interrogation by the government."    *United States v. Gaddy*, 894 F.2d 1307, 1313 (11th Cir. 1990) (quotations omitted).

Arias's actions suggest that he acted on his own—not at the government's direction.    First and foremost, Arias was not yet talking with the government when he paid for Blair's lawyers. Plus, he started recording his conversations with Blair before he

started cooperating with, or even talking to, the government.    So while the government knew that Arias regularly recorded his conversations with Blair, that was a long-time practice—not one that he adopted at the government's direction.    Nor did the government ask him to collect evidence or provide recordings of incriminating conversations in exchange for a reward.    Many criminal defendants collect information on their co-conspirators in hopes of eventually getting a better deal for themselves.    Arias is no different.    Except that he had yet another motive—documenting Blair's threats to (literally) burn down his unrelated, legitimate business.

Blair, in short, has not shown that Arias was a government agent, which means his *Massiah* claim fails.    *See Baxter*, 45 F.3d at 1510.

## B.

Blair next argues that the district court should not have admitted the texts, photos, and FaceTime call records extracted from his cell phone, again for two reasons.[2]

*First*, he claims that the government did not properly authenticate the phone's contents.    Evidence is authenticated if the presenter shows that it is what he claims it to be.    *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990).    Only "some

---

[2] We review district court evidentiary rulings for abuse of discretion.    *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006).

competent evidence" is needed, and circumstantial evidence can suffice. *Id.* (quotation omitted).

Here, Special Agent Rutherford testified that he extracted the contents of Blair's phone using Cellebrite, reviewed the proposed exhibit (a flash drive containing the extraction), and confirmed that the data on the flash drive matched the data he had extracted using Cellebrite. Rutherford's testimony is enough to authenticate the extracted data.

Even so, Blair challenges the integrity of the Cellebrite extraction, arguing that there may have been a problem because his phone had the Signal app. He admits that his concerns on this front are "hypothetical." Still, he suggests that a claim from Signal's founder that he hacked Cellebrite (three years after the program was used on Blair's phone) calls the entire extraction into question. Omitted from Blair's argument, however, is any evidence about how and why that claim undermines the Cellebrite pull. Blair does find it fishy that the extraction data from the Runmeter app (which had nothing to do with the case) contained date labels from four years in the future. But he never explains how irrelevant data from an exercise app taints the reliability of the texts, photos, and call records the government pulled from his phone.

We see no evidence of a problem. And other witnesses confirmed the accuracy of at least some of the materials pulled from his phone, including call records and a photo showing cans of "fruit." Such independent proof of the accuracy of the evidence

makes us "extremely reluctant to disturb the trial court's decision." *United States v. Harrell*, 788 F.2d 1524, 1527 (11th Cir. 1986) (quotation omitted).

*Second*, Blair argues that the government needed to provide an expert witness to explain the extraction process, rather than just the agents who plugged in the phone and ran the program. Not so—the technical side of Cellebrite as used in this case is irrelevant. It is plug-and-play technology that requires no special skill or knowledge to operate, and similar evidence is allowed without expert testimony. The best example is *United States v. Mapson*, where photos from a license plate surveillance system were entered into evidence with testimony from an officer who described the system as "just a camera" allowing officers to retrieve data by entering either a car's license plate or its make, model, and year. 96 F.4th 1323, 1335 (11th Cir. 2024) (quotation omitted). We reasoned that no expert testimony was required because the testimony was not "technical or specialized" and because it was based on the officer's "personal experiences," rather than expert knowledge. *Id.* at 1335–36. So too here—like the surveillance system in *Mapson*, Cellebrite requires no special skills or knowledge to use.

Blair disagrees. But his strongest authority is an out-of-circuit case requiring an expert for testimony about forensic data pulled with a different tool. *United States v. Ganier*, 468 F.3d 920, 924 (6th Cir. 2006). And interpreting that data—"a heading, a string of words and symbols, date and time, and a list of words"—

23-13642                Opinion of the Court                11

required "knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson." *Id.* at 926. Cellebrite is different—again, no specialized knowledge is needed to run that tool or interpret its output. *United States v. Williams*, 83 F.4th 994, 997 (5th Cir. 2023). The district court did not abuse its discretion in allowing the Cellebrite evidence to be admitted by lay testimony.[3]

## C.

Blair argues that he should have been able to call former Assistant United States Attorney Ryan Christian to testify about Arias's character for truthfulness. He made two requests, both of which were denied by the Department of Justice, and the district court granted motions to quash the related subpoenas.[4]

The Department of Justice has promulgated regulations to govern and centralize its responses to record requests. 5 U.S.C § 301; 28 C.F.R. pt. 16. These regulations are valid and can

---

[3] While this is a matter of first impression here, other circuits that have considered the issue agree. The Fifth and Ninth Circuits have held that Cellebrite evidence needs no expert testimony to be admitted. *See Williams*, 83 F.4th at 997 (5th Cir.); *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1267 (9th Cir. 2024). The Second and Fourth have done the same, albeit in unpublished opinions. *United States v. Marsh*, 568 F. App'x 15, 17 (2d Cir. 2014); *United States v. Chavez-Lopez*, 767 F. App'x 431, 434–35 (4th Cir. 2019).

[4] We review a motion to quash for abuse of discretion. *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991). We review whether the Department's application of its *Touhy* regulations was arbitrary, capricious, or an abuse of discretion. *Id.*

lawfully bar employees from testifying.    *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951); *see, e.g.*, 28 C.F.R. §§ 16.23, 16.26. The Department denied Blair's *Touhy* requests because it concluded that Christian's testimony was not admissible evidence. After each denial, Blair persisted in seeking a subpoena, and the Department moved to quash.    The district court granted the Department's motions, concluding that the government's decision to bar the testimony was not arbitrary and capricious.

Blair's primary contention on appeal is that the *Touhy* regulations do not apply to former employees.    That argument fails out of the gate—they do, and we have already said so.    *United States v. Bizzard*, 674 F.2d 1382, 1387 (11th Cir. 1982).

Blair next argues that because Christian's testimony was admissible under the federal rules it should have been admitted under *Touhy*, but he falters there, too.    Federal Rule of Evidence 608(a) permits a witness to attack the credibility of another witness's testimony with evidence about their character, but certain standards apply.    Rule 602 requires that a lay witness testify based on personal knowledge.    *See United States v. Watson*, 669 F.2d 1374, 1382 (11th Cir. 1982).    And Rule 701 offers a similar principle, requiring that testimony be based on a witness's own perception.

Though the baseline set by these two rules is low, Blair does not come close to meeting it.    His first *Touhy* request sought testimony about statements that Christian made as an attorney at Arias's bond hearing.    At the time of that hearing, Christian had

not interviewed Arias—indeed, he stated at the hearing that his perspective on Arias came from "reviewing the evidence in this case."   So he had no personal knowledge of Arias's character. The district court correctly noted, among other things, that merely reviewing evidence is not the right basis for character testimony. Because Blair failed to show that the Department's refusal to present Christian for testimony was arbitrary and capricious, the court properly quashed the first subpoena.

Blair's briefing is not clear about the sequence of events below (or even which *Touhy* ruling he is appealing), but it appears that he filed a second *Touhy* request shortly after the district court granted the motion to quash the first one.[5]   Blair's new request sought Christian's testimony as it existed at the time of trial, which would have swept in his personal knowledge from a proffer session with Arias.   It seems likely that this expanded request was meant to get around the fact that Christian had no personal knowledge about Blair's truthfulness during the bond hearing.

The district court dispatched this follow-up quickly, and so can we.   The single proffer session was not enough to give Christian a proper foundation to testify about Arias's character for truthfulness.   A prosecutor and a defendant negotiating a plea is a far cry from the natural habitat of either party—interactions in that context simply do not provide the type of knowledge needed to

---

[5] Though Blair's second subpoena and related *Touhy* request appear neither in the record on appeal, nor on the district court docket, the Department's motion to quash does.

14　　　　　　　　　Opinion of the Court　　　　　　　23-13642

support an opinion about someone's character for truthfulness. So a single witness interview generally would not create an adequate basis for opinion testimony from a lawyer, and the facts here offer no reason to depart from that rule. *See Watson*, 669 F.2d at 1382; *United States v. Dotson*, 799 F.2d 189, 193 (5th Cir. 1986).

Indeed, in other contexts, we have also been skeptical about treating lawyers as witnesses, especially where their views on criminal defendants are concerned: "advocacy as to the credibility of witnesses" is not "equivalent to a testimonial statement" by the party. *United States v. DeLoach*, 34 F.3d 1001, 1005–06 (11th Cir. 1994) (quotation omitted). Consider this—if Christian's testimony about Arias would be allowed in Blair's trial, would that same testimony have been permitted against Arias himself had he gone to trial? No to both, for the obvious reason that prosecutors are not neutral arbiters of defendants' character.

Other circuits agree that brief interactions between investigators and witnesses do not provide a reliable basis for opinion testimony about their character. *Dotson*, 799 F.2d at 193 (a six-year relationship between an agent and witness in the context of an investigation); *United States v. Cortez*, 935 F.2d 135, 139–40 (8th Cir. 1991) (two meetings with an informant totaling several hours); *United States v. Garza*, 448 F.3d 294, 296–97 (5th Cir. 2006) (several conversations between an investigator and a witness). We see no reason to set a different rule.

We thus agree with the district court that Christian's testimony was (at a minimum) "very unlikely" to have been admissible.    So the Department, in denying the request for Christian's testimony on that basis, did not act arbitrarily or capriciously.    And the district court, in quashing the subpoena, did not abuse its discretion.

### D.

The next issue concerns jury instructions.[6]  The prosecution argued that Blair either knew that the cans contained cocaine or deliberately avoided learning more about them despite many red flags.    The judge instructed the jury on both actual knowledge and deliberate ignorance—the conscious effort to avoid learning incriminating information.    Blair says the deliberate ignorance instruction was unjustified because the government was arguing actual knowledge.    And by presenting the deliberate ignorance instruction, he insists, the court prejudiced his defense by creating a risk the jury would find him guilty on a lesser standard of negligence.    He also contends that the jury lacked sufficient evidence to find that he acted with knowledge.

A deliberate indifference instruction should be given only when facts support the inference that there was "a high probability" the defendant purposefully avoided "learning all of the facts in order to have a defense in the event of a subsequent

---

[6]  We review whether jury instructions misstate the law or mislead the jury de novo.    *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013).

16                    Opinion of the Court                    23-13642

prosecution." *United States v. Maitre*, 898 F.3d 1151, 1157 (11th Cir. 2018) (quotations omitted). But no error exists if, as is often the case, "the evidence could support both actual knowledge or deliberate ignorance and the jury was instructed on both." *Id.* That's true here: the evidence presented at trial easily supports both instructions.

Blair received $434,195 in cash to give free trips to travelers and deliver the cans they brought back. Days after he delivered the cans, thousands of dollars would flow into his bank account. Blair's story was that he was "running a business," and that he didn't know he was doing anything wrong because Arias told him the cans had "untraceable cocaine" that wouldn't "test positive" because it "was not chemically cocaine"—and thus "not illegal." But whatever Blair thought was in the cans, he also knew someone else thought it was worth paying hundreds of thousands of dollars to smuggle them into America. Still, he did not investigate. The deliberate ignorance jury instruction did not mislead the jury, and we affirm the use of the instruction.

Additionally, any error is harmless if the district court instructed the jury on actual knowledge and the jury could have reasonably convicted on that theory. *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008). That's true here. In July 2017, Blair took a video of cans inside Arias's apartment and texted it to Arias. Arias responded, "Delete." And then in a second message, "Double delete." Then Blair said, "Stfu I already knew but I wanted to be clear of everything." Shortly after sending the

video, Blair drove from Atlanta to Rhode Island and waited in a hotel for six days.    On another trip, Blair actually saw the cocaine inside the cans when one had "busted open" and cocaine was "dripping off."    Arias told Blair he "couldn't believe that he didn't get arrested," or that "dogs didn't smell it."    But "Blair didn't care" and "just wanted his money."

These are only a few examples; the record is flush with evidence that Blair knew the cans contained cocaine.    Because the evidence supported both instructions and was sufficient to convict under either, we affirm the jury instructions.

### E.

Blair also argues that the government violated his due process rights by presenting inconsistent theories at Arias's and Blair's sentencing hearings.[7]    For Blair, the government argued that he was responsible for at least 150 kilograms of cocaine.    But in Arias's plea agreement, the government had agreed that he was responsible for five to fifteen kilograms of cocaine.    Because Arias was the primary supplier of his cocaine, Blair insists, the government cannot argue that he was responsible for at least ten times as much cocaine as Arias.    Pressing these factually inconsistent theories, he says, violates due process.

He is incorrect.    Arias had a cooperation agreement in which the government agreed not to use information that he

---

[7] We review due process claims de novo.    *United States v. Hunt*, 526 F.3d 739, 743 (11th Cir. 2008).

provided when determining his sentencing range.    But that agreement did not extend to Blair, and the larger number at Blair's sentencing was based on Arias's testimony.    No problem.    But to use that same information against Arias would have violated *his* due process rights.    *Rowe v. Griffin*, 676 F.2d 524, 528 (11th Cir. 1982).    Blair does not get to piggyback on Arias's agreement and insist that the prosecution give him the benefits of Arias's cooperation.    Plea bargaining is "an essential component of the administration of justice."    *Santobello v. New York*, 404 U.S. 257, 260 (1971).    But it would become a dead letter in conspiracy cases if an agreement with one defendant tied the government's hands for all the rest.

Blair's only authorities, two out-of-circuit cases, do not move the needle.    In *Smith v. Groose*, the government "changed the color of its stripes from one trial to the next" by advancing "inherently factually contradictory theories" in two separate prosecutions for the same crime.    *United States v. Hill*, 643 F.3d 807, 834 (11th Cir. 2011) (quoting *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000)).    That fact pattern is a far cry from this one. As for *Thompson v. Calderon*, that case was reversed by the Supreme Court and in any event involved two murder convictions prosecuted with fundamentally different theories and factual assertions.    120 F.3d 1045, 1056 (9th Cir. 1997) (en banc), *rev'd*, 523 U.S. 538 (1998).    Not so here—the government just gave a better deal to a cooperating witness.    We see no error.

Blair also argues that this same problem resulted in an incorrect sentence.    But what Blair labels a challenge to his "procedurally unreasonable sentence" is really just a rehashing of his due process argument.    A sentence is procedurally unreasonable if there is "a significant procedural error" like improper calculation of a Guidelines range, failure to adequately explain the sentence, or failure to consider the sentencing factors. *United States v. Green*, 981 F.3d 945, 953 (11th Cir. 2020) (quotation omitted).    Blair makes no arguments even remotely along these lines.    Using the words "procedurally unreasonable" is not enough for a cognizable sentencing challenge, and Blair fails to raise one.

Though he does make a proper substantive reasonableness challenge, he largely recycles the same arguments, and this attempt fails too.[8]    We "vacate a sentence as substantively unreasonable if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing" the sentencing factors.    *United States v. Riley*, 995 F.3d 1272, 1278 (11th Cir. 2021) (quotation omitted).    Blair claims his sentence was substantively unreasonable because it was five times as long as Arias's, even though Arias had a much larger role in the conspiracy. But Blair cannot use Arias as a comparator in arguing about a disparity—Arias cooperated and pleaded guilty while Blair did not,

---

[8] We review the substantive reasonableness of a sentence for abuse of discretion, considering the totality of the circumstances.    *United States v. Barrington*, 648 F.3d 1178, 1203 (11th Cir. 2011).

and the district court considered this distinction when weighing the sentencing factors. We have long recognized that individuals who cooperate are not similarly situated to those who provide no help to the government and go to trial. *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009). Plus, his sentence fell eighty-four months below the Guidelines range, meaning that any departure from the Guidelines cut in Blair's favor. *See United States v. Castaneda*, 997 F.3d 1318, 1332 (11th Cir. 2021). Blair's sentence, in short, is substantively reasonable.

★　　★　　★

We **AFFIRM** the judgment of the district court.