[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-12166

_____

D.C. Docket No. 1:16-cr-20418-UU-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

NAOMIE MAITRE,
a.k.a. Black Nate,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 7, 2018)

Before WILLIAM PRYOR and MARTIN, Circuit Judges, and HALL,* District
Judge.

MARTIN, Circuit Judge:

_____

* Honorable James Randal Hall, United States Chief District Judge for the Southern
District of Georgia, sitting by designation.

Naomie Maitre appeals her conviction and sentence after a jury found her guilty of charges related to access device fraud and identity theft. After careful consideration, and with the benefit of oral argument, we affirm the District Court in all respects.

## I.    BACKGROUND

A superseding indictment charged Ms. Maitre, Willie Smith, Daryl Pugh, and two others with conspiracy to possess 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3) and (b)(2) (Count 1). Ms. Maitre was also charged with possession of 15 or more unauthorized access devices on November 12, 2014, in violation of 18 U.S.C. § 1029(a)(3) (Count 2); possession of 15 or more unauthorized access devices on January 7, 2015, in violation of 18 U.S.C. § 1029(a)(3) (Count 4); and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 8, 9). Ms. Maitre denied these charges and went to trial.

At trial the government introduced evidence that in September 2014 Miami police began investigating a string of early-morning burglaries of parked cars. Police got a tip that the burglars lived at 11804 Northwest 1st Avenue, so officers began watching the house. On November 12 the police saw a dark gray Infiniti parked outside the house. The Infiniti's appearance and license plate matched that of a car seen fleeing the scene of a vehicle burglary the day

2

before.  Later that day the police tried to conduct a traffic stop of a different car that briefly visited the house.  The driver fled, then crashed the car.  When the officers got to the scene, the driver was gone.  In the car they found identification documents ("IDs")[1] and credit cards spilled on the floor, as well as a magazine loaded with ammunition for a handgun.

The officers decided to go back to the 11804 Northwest 1st Avenue house and talk to the residents.  Nearly four hours after officers first knocked on the door, they got a phone call passing along a message from Ms. Maitre that the residents were "willing to surrender if they were going to be okay."  Ms. Maitre then came outside, along with Mr. Smith and two others.  The officers told Ms. Maitre about their investigation and asked why she took so long to answer the door.  She said she had been asleep and had not known the officers were there.  She confirmed she lived at the house and consented to a search.

Inside the master bedroom shared by Ms. Maitre and her boyfriend Mr. Smith, the police found three purses containing smaller handbags or wallets.  One of these also had a "bundle" of IDs and credit cards inside.[2]  The smaller wallets had more IDs inside them.  In the attic crawl space was a backpack holding many

---

[1] We use this term to describe anything that contains personal identifying information.  This is different from an "access device" or "means of identification" as those terms are used in the statute, and in turn, this opinion.

[2] Bundling describes rubber-banding together all IDs belonging to a single identity, or victim, to make identity theft easier.

ID bundles.  In the living room, officers found a first-aid medical pack containing a military ID inside a drawer in the TV stand.  Ms. Maitre said she didn't know where the pack came from, but she put it in the TV stand's drawer because she didn't have another place to put it.  In all, the officers seized IDs and credit cards belonging to over 350 different people that day.

Police also found 59 to 69 purses; a backpack containing 28 pairs of sunglasses and prescription glasses; a bag holding 18 cellphones; and a shoebox with 10 car keys.  Ms. Maitre said she collected purses and Mr. Smith would buy them from flea markets or garage sales for her.  She said sometimes they still held the previous owners' belongings, including IDs, but she didn't seem to think this was out of the ordinary.

The police didn't arrest Ms. Maitre that day, although they confiscated the IDs and most of the personal items they found.  The officers explained that the search showed the burglars' conduct went beyond just car burglaries and involved identity theft, which needed more investigation.  They continued watching Ms. Maitre and the house.  A few times officers tried to follow Ms. Maitre when she left the house, but she engaged in "heat runs,"[3] making it difficult for the officers to follow her without risking their safety or revealing their presence.

---

[3] We use the term "heat run" to describe counter-surveillance measures used to determine if the driver is being followed.  These include driving "aggressively fast and slow"; "mak[ing] sudden U-turns to see if someone was behind [the driver]"; "stopping at a light when it's green

Then, on January 7, 2015, Lisa Cheuvront, Natalie Persaud, Natasha Solivan, and Linda Joseph reported their cars had been burglarized, all early in the morning. A witness to one of these burglaries saw a black Chrysler 200 and got its license plate number, CAV-T48. Detective Adam Shahan had seen a similar car outside Ms. Maitre's house and drove there immediately, arriving at about 8 AM. The black Chrysler pulled up a few minutes later. Mr. Smith was driving and Mr. Pugh was in the passenger seat. Detective Shahan saw Mr. Smith open the trunk and hand a black satchel or bag to Mr. Pugh, who took it inside the house. Mr. Smith stayed outside and changed the license plate on the car.

Later that day, Ms. Maitre drove the Chrysler twice. The second time, she had Mr. Smith, Mr. Pugh, and another person as her passengers, and Detective Shahan followed her. He saw her driving "very erratically"— speeding, making a sudden U-turn—and eventually pull into a Dollar Store parking lot, next to the store's dumpster. Mr. Pugh got out and tossed a bag into the dumpster. Police conducted a stop, arrested everyone, and searched the car. Officers found "center punches," which are tools used to break car windows, and Ms. Persaud's phone in plain view. In the store's dumpster, they found Ms. Persaud's purse and the CAV-T48 license plate.

---

[and] waiting for it to turn red to make sure any vehicles that followed could not follow"; and "going into dead-end streets."

5

The police then got a search warrant for Ms. Maitre's house. During this January 7, 2015 search, they found Ms. Cheuvront's and Ms. Solivan's purses on the living room couch; stacks of credit cards and bank deposit slips in the living room bookshelf; cards and receipts in the dining area; and an ATM card in the bathroom cabinet. In Ms. Maitre and Mr. Smith's bedroom, officers found a garbage bag holding several purses; a dresser drawer containing money, credit cards, and gift cards; a purse filled with prepaid debit cards; another purse full of chargers and cell phone accessories; and a suitcase full of chargers, cell phones, and tablets. Inside a "shoe-shaped chair" in the bedroom, they found a black bag and a stolen, loaded gun. Ammunition in Ms. Maitre's underwear drawer matched the gun. The black bag from the chair had several bundles of IDs, among them Ms. Cheuvront's driver's license and Ms. Persaud's credit card. The police also found Ms. Joseph's iPad in a trash can outside the house.

During her trial, Ms. Maitre called two witnesses in her defense. Sayire Crosdale testified that she and Ms. Maitre had been friends for about 25 years and that she left her purse at Ms. Maitre's house many times. The second witness was Mr. Smith, who pled guilty to some of the charges against him. He testified that he "took full responsibility" for the crimes and Ms. Maitre had no part in them. He said he hid his illegal activity from her, including putting the stolen property in places where she wouldn't look. He gave purses or pocketbooks to Ms. Maitre as

6

gifts, but didn't tell her where they came from. He claimed the gun and ammunition, and said it was originally in his underwear drawer, not hers. On cross-examination, he confirmed that many of the items were in plain view or in locations to which Ms. Maitre had access. He also said he didn't have a job, he just helped an uncle at his car wash sometimes or helped a different uncle in a wheelchair. He said Ms. Maitre knew these were his only "potential jobs." He estimated he gave her 15 to 20 purses while they dated, but said he never gave her anything with victims' IDs in it. He testified that she didn't ask questions when he gave her things.

During the jury charge conference, the District Court suggested a deliberate ignorance instruction was appropriate and presented the parties with a modified version of the pattern instruction. Ms. Maitre objected, but the government argued there was a factual basis for giving the instruction. The court overruled the objection, and gave the deliberate ignorance instruction.

The jury found Ms. Maitre guilty on all counts except for Count 2. The District Court sentenced her to 94-months imprisonment. This appeal followed.

## II.    CONVICTION-RELATED CHALLENGES

Ms. Maitre challenges her conviction on two grounds. First, she argues it was error to give the deliberate ignorance instruction. Second, she challenges the

sufficiency of the evidence on the conspiracy and aggravated identity theft counts. We address each in turn.

## A.    DELIBERATE IGNORANCE INSTRUCTION[4]

"We review jury instructions de novo to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." United States v. Myers, 972 F.2d 1566, 1572 (11th Cir. 1992).  However, we give district courts "wide discretion as to the style and wording employed." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1276 (11th Cir. 2008).  We "will not reverse a conviction unless, after examining the entire charge, [we] find[] that the issues of law were presented inaccurately, the charge included crimes not contained in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process." United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993) (quotation omitted).

This Court considers "deliberate ignorance of criminal activity as the equivalent of knowledge." Id. (quotation omitted).  The instruction is appropriate when there are facts supporting the "inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to

---

[4] The record on appeal includes a copy of the District Court's deliberate ignorance instruction in the context of the final jury instructions, but does not include a transcript of the court reading the instruction to the jury.  The government initially argued that Ms. Maitre's failure to order the transcript meant the issue was unreviewable.  However, the government acknowledged at oral argument that the record shows the court gave the instruction and that the issue of the propriety of giving the charge is reviewable.

avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." United States v. Steed, 548 F.3d 961, 977 (11th Cir. 2008) (per curiam).  It is error to give the instruction when there is evidence of only actual knowledge, but not when the evidence could support both actual knowledge or deliberate ignorance and the jury was instructed on both.  Id.

Ms. Maitre argues no facts supported an inference that she purposely contrived to avoid learning all of the facts beyond her own denial of knowledge. We conclude to the contrary.  Mr. Smith testified that Ms. Maitre knew he didn't have a job and yet she accepted 15 to 20 purses from him as gifts without asking more.  She told police during the first search on November 12 that Mr. Smith gave her purses with other people's wallets and IDs in them, but did not seem concerned about how or why those belongings came to be inside the purses.  Also, Ms. Maitre knew about the police's investigation after November 12.  And even after the November 12 discoveries, on January 7, police found more evidence among her things, in her bedroom, and in plain view all over the house.  Thus, even after she was told that some of the things in her house were stolen goods, she never asked Mr. Smith about new and similar items as they started appearing in her house.  These facts suggested deliberate ignorance and the District Court was right to give the instruction.  See id.

B.    SUFFICIENCY OF THE EVIDENCE

We review de novo challenges to the sufficiency of the evidence, "view[ing] the evidence in the light most favorable to the Government and resolv[ing] all reasonable inferences and credibility evaluations in favor of the verdict." United States v. Isnadin, 742 F.3d 1278, 1303 (11th Cir. 2014).

With respect to the conspiracy count, Ms. Maitre argues the government's evidence shows only that she lived with a burglar in a house full of stolen goods. She says the significant amount of evidence found in her house is not enough, on its own, to demonstrate her knowing and voluntary agreement to join the conspiracy. In order to prove a conspiracy to violate 18 U.S.C. § 1029(a)(3), the government must show (1) the defendant knowingly and voluntarily joined an agreement to possess 15 or more unauthorized access devices with intent to defraud, and (2) at least one conspirator acted in furtherance of the conspiracy. See 18 U.S.C. § 1029(a)(3), (b)(2).

Contrary to Ms. Maitre's argument, the government presented more evidence than just the sheer volume of stolen goods found in the house. For example, many stolen items were found in plain view and in places where Ms. Maitre would see them, including her bedroom and closet. Ms. Maitre engaged in "heat runs" to avoid being followed after November 12 when she learned the police were investigating her in connection with the car burglaries. She drove Mr.

10

Smith and Mr. Pugh to throw away evidence from burglaries in a car containing, in plain view, a stolen phone and devices used to break into cars. Between November 12 and January 7, her house again filled with stolen goods. And the ammunition found in her underwear drawer matched the gun found in the shoe-shaped chair in her bedroom. This was the same chair that also contained many bundles of stolen IDs. On this record, a reasonably jury could find that Ms. Maitre knowingly and voluntarily joined the conspiracy.[5]

As to the aggravated identity theft charges, Ms. Maitre argues the government did not present sufficient evidence demonstrating her possession of the stolen identifications or her knowledge that the identifications belonged to real people. Aggravated identity theft requires proof that the defendant "'during and in relation to' certain felonies, including 18 U.S.C. § 1029(b)(2)," knowingly transferred, possessed, or used the means of identification of another

---

[5] In the section of Ms. Maitre's brief challenging her conspiracy conviction, she also argues the evidence did not demonstrate her possession of the stolen items. To the extent this argument reflects her view that the only way to prove her knowing and voluntary agreement to join the conspiracy is to prove her actual or constructive possession of the stolen goods, she is mistaken. See United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983) ("A defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy."). To the extent Ms. Maitre is also challenging her conviction as to Count 4 for possession of 15 or more unauthorized access devices on January 7, 2015, the evidence was sufficient on that count as well. See United States v. Baldwin, 774 F.3d 711, 722–23 (11th Cir. 2014) ("A person constructively possesses an item when he has knowledge of the thing possessed coupled with the ability to maintain control over it or reduce it to his physical possession, even though he does not have actual personal dominion," or when "a person exercises ownership, dominion, or control over the contraband itself or dominion or control over the premises or the vehicle in which the contraband is concealed." (quotations omitted and alteration adopted)).

11

person without lawful authority and knowing the identifications belonged to "real people." Baldwin, 774 F.3d at 723 (quoting 18 U.S.C. § 1028A(a)(1)). The means of identification charged in these counts were Ms. Cheuvront's driver's license and Ms. Persaud's credit card, both found in the shoe-shaped chair in Ms. Maitre's bedroom.

The government presented evidence that Ms. Maitre was at home on January 7 when Mr. Smith and Mr. Pugh returned with their stolen gains from that morning's four car burglaries. She then drove them to the Dollar Store parking lot to dispose of evidence related to those burglaries. When the police entered Ms. Maitre's house to search it, they immediately saw Ms. Cheuvront's and Ms. Solivan's stolen purses on the living room couch. Ms. Cheuvront's driver's license and Ms. Persaud's credit card were found in the shoe-shaped chair in Ms. Maitre's bedroom, alongside a loaded gun, with more ammunition for that gun found in her underwear drawer. This evidence is enough to support a finding that Ms. Maitre constructively possessed the means of identification with which she was charged. See id. at 722–23.

There was also evidence to support a finding that Ms. Maitre knew the identifications belonged to real people. See id. at 723. The evidence supporting her knowing and voluntary participation in the conspiracy also demonstrates her awareness of the car burglaries. For example, after Ms. Maitre was stopped on

12

January 7, officers found Ms. Persaud's phone and devices for breaking into cars in plain view in her car, and Ms. Persaud's purse and the CAV-T48 license plate were in the Dollar Store's dumpster. And if Ms. Maitre was aware that the purses, phones, and iPads were stolen from cars, it was reasonable to infer that she knew the means of identification taken from these purses belonged to real people. Thus, the evidence was sufficient to support the aggravated identity theft convictions.

### III.    SENTENCING-RELATED CHALLENGES

We next turn to Ms. Maitre's challenges to her sentence. We review a sentencing court's findings of fact for clear error and review de novo its application of the United States Sentencing Guidelines. United States v. Jordi, 418 F.3d 1212, 1214 (11th Cir. 2005).

We first address her argument that the District Court erred in denying her a minor-role reduction under Guideline § 3B1.2. Ms. Maitre contends she was "merely a passive observer to the conduct" and her involvement was "substantially less material than the other defendants." However, in light of the evidence we've described, the District Court's finding that Ms. Maitre was a "full, equal participant with Mr. Smith" is not clearly erroneous.

Ms. Maitre also challenges the District Court's loss calculation. Guideline § 2B1.1(b)(1) increases a defendant's offense level by 14 points if the defendant's

13

conduct resulted in a financial loss greater than $550,000 but less than $1.5 million.  USSG § 2B1.1(b)(1)(H)–(I).  For offenses involving an "unauthorized access device, loss . . . shall be not less than $500 per access device."  Id. § 2B1.1 cmt. n.3(F)(i).  An "unauthorized access device" is "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud."  18 U.S.C. § 1029(e)(3); see USSG § 2B1.1 cmt. n.10(A) (defining "unauthorized access device" by reference to 18 U.S.C. § 1029(e)(3)).  An "access device" is

> any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

18 U.S.C. § 1029(e)(1).

If the defendant challenges the loss calculation, the district court must "make factual findings sufficient to support the government's claim . . . based on a preponderance of the evidence."  United States v. Patterson, 595 F.3d 1324, 1327 (11th Cir. 2010).  However, a failure to make specific findings will not result in reversal "[i]f the record otherwise supports the court's determinations."  Baldwin, 774 F.3d at 727.  Although the Guidelines require only a "reasonable estimate of the loss" and not a "precise determination," a district court's loss finding cannot be based on speculation.  See id. (quotations omitted).  Indeed, when the

14

government's evidence includes an item containing personal identifying information, but does not specify the kind of information sufficient for the court to reasonably make a finding that the item qualifies as an "access device," the court cannot properly rely on it as a basis for loss. See United States v. Wright, 862 F.3d 1265, 1276 (11th Cir. 2017) (remanding case for resentencing because the record evidence "used the term 'personal identifying information' without describing what that information was").

In Ms. Maitre's case, an investigating officer testified at sentencing that police collected 1,348 access devices from Ms. Maitre's house on November 12 and 196 access devices on January 7. The government also introduced exhibits created by the officer, identifying each item as a driver's license, passport, social security card, credit or debit card, check, or described the item if it didn't clearly fit one of these categories. On cross-examination, the officer admitted he had erred by including access devices belonging to Ms. Maitre's friend, Ms. Crosdale. The District Court assigned a $500 value to each device and subtracted $2,000 for those access devices belonging to Ms. Crosdale, to reach a loss amount of $770,000. This resulted in a 14-point increase in Ms. Maitre's offense level.

On appeal, Ms. Maitre argues the District Court erred because its loss calculation relied on an incorrect finding that "passports, social security cards,

15

driver licenses, and membership cards" are access devices.[6]  Because Ms. Maitre

did not make this argument to the District Court, we review it for plain error.[7]

See Patterson, 595 F.3d at 1326.

The District Court's loss calculation was not clearly erroneous.  By our

count, the officers collectively found 790 credit and debit cards, 118 social

security numbers, and 205 Florida driver's licenses in Ms. Maitre's house.

Because we have previously recognized credit cards, debit cards, and social

security numbers as access devices, there was no error in including these in the

loss calculation.  See Wright, 862 F.3d at 1275.  Neither was there error in

including driver's licenses as those also qualify as "access devices."  See 18

U.S.C. § 1029(e)(1).  Driver's licenses have a "personal identification number,"

which is associated with a photograph, a name, a date of birth, and an address.

---

[6] Ms. Maitre also argues that because the jury acquitted her of Count 2—possession of at least 15 unauthorized access devices on November 12—she should not be held accountable for any access devices collected from her house that day.  However, "[s]entencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence," United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006) (quotation omitted), and the record supports a finding that the access devices found at Ms. Maitre's house on November 12 were part of her relevant conduct, see USSG § 1B1.3(a)(1)(B) (stating relevant conduct for a conspiracy includes all "reasonably foreseeable" acts and omissions of other co-conspirators that were "within the scope of the jointly undertaken criminal activity" and "in furtherance" of it).  The District Court's failure to make an explicit finding about the scope of her relevant conduct is not a reason for reversal.  See Baldwin, 774 F.3d at 727.

[7] "Plain error requires the defendant to show: (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Patterson, 595 F.3d at 1326.

16

They can thus establish identity and be used in conjunction with another access device to obtain money, goods, services, or other things of value.  See id.

This record includes ample evidence of at least 1,113 access devices. Assigning each device a $500 value as the District Court did, less $2,000 for the access devices belonging to Ms. Crosdale, the final loss amount is $554,500.  This supports the 14-level increase in Ms. Maitre's offense level.  See USSG § 2B1.1(b)(1)(H)–(I).

**AFFIRMED.**