[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 22-12984

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MYKHAYLO CHUGAY,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:21-cr-10008-JEM-1

————————————————

Before WILSON, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Mykhaylo Chugay appeals his total 292-month sentence for conspiracy to harbor aliens and induce them to remain, conspiracy to engage in money laundering, and conspiracy to defraud the United States.  On appeal, Chugay argues that the district court erred by: (1) applying an aggravating role enhancement; (2) applying an obstruction of justice enhancement; (3) applying an enhancement for encouraging others to violate the internal revenue laws; and (4) calculating the loss amount.  Chugay also argues that his sentence is procedurally and substantively unreasonable because the district court failed to adequately explain its sentence and the sentence fails to avoid unwarranted sentence disparities.  For the following reasons, we affirm.

## I.

A federal grand jury returned a three-count superseding indictment against Chugay and codefendants Oleksandr Morgunov and Volodymyr Ogorodnychuk.  The indictment charged Chugay with: one count of conspiracy to harbor aliens and induce them to remain, in violation of 8 U.S.C. § 1324(a)(iii), (iv), and (v)(I) (Count 1); one count of conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h) (Count 2); and one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 3).  Oleg Oliynik and Oleksandr Yurchyk were co-conspirators charged in a separate indictment.

The superseding indictment alleged that, between August 2007 and through at least August 2021, the defendants owned and operated several labor staffing companies, including: General Labor Solutions, LLC ("General Labor Solutions"); Liberty Specialty Service, LLC ("Liberty Specialty Services"); Paradise Choice, LLC ("Paradise Choice"); Paradise Choice Cleaning, LLC ("Paradise Choice Cleaning"); Tropical City Services, LLC ("Tropical City Services"); and Tropical City Group, LLC ("Tropical City Group") (collectively, the "labor staffing companies"). In practice, these labor staffing companies were operated as one entity. Through these companies, the defendants facilitated the employment of nonresident aliens who were not authorized to work in the United States and provided workers for hotels, bars, and restaurants in the Key West area ("hospitality clients"). Oliynyk and Yurchyk left the United States and returned to Ukraine, where they have remained since 2013 and 2016, respectively, but they continued to communicate with the co-conspirators and to exercise control over the labor staffing companies.

Ogorodnychuk and Morgunov pleaded guilty, and Chugay continued to trial. Ogorodnychuk was sentenced to 48 months' imprisonment, and Morgunov was sentenced to 96 months' imprisonment.

At trial, the government called Sergiy Lopatyuk, who testified to the following. He was formerly partners with Oliynik and Yurchyk in General Labor Solutions, an illegal labor staffing business operating in Key West. Lopatyuk explained that there were

several labor staffing companies operating in the Key West area who provided workers for hospitality clients. Although the workers were employed by the labor staffing companies, the hospitality clients made the ultimate hiring decision, provided training, provided uniforms, and managed the workers on the property. The hospitality clients would track the workers' hours and send the total to the labor staffing companies. The hospitality clients did not hire the workers directly because around 95 percent of the labor staffing company workers did not have authorization to work, and the labor staffing companies did not verify employment authorization. The labor staffing companies also helped prevent the hotels from having to pay employment taxes. General Labor Solutions did not withhold federal employment or federal income taxes from workers' pay and did not pay the employer's share of the employment taxes.

Chugay first came to work for General Labor Solutions as a worker in 2007 or 2008, and he eventually took on a role in Oliynyk and Yurchyk's labor staffing business. The government introduced a General Labor Solutions payroll from 2008, which Lopatyuk confirmed listed Chugay and Morgunov as workers placed at Key West restaurants. The government introduced the Articles of Organization for Liberty Specialty Service, filed in 2009, signed by Chugay, who was listed as the manager. Oliynyk and Yurchyk kicked Lopatyuk out of the labor staffing business around 2010, and he moved to Miami.

Ogorodnychuk testified to the following.  He began helping Chugay run the labor staffing companies in around 2016.  To his knowledge, about 80 percent of the labor staffing companies' workers were illegal aliens without work authorization.  He testified that at least ten people were involved in the conspiracy and that Oliynik and Yurchyk were at the top of the hierarchy.  When asked how he perceived himself in terms of a relationship vis-à-vis other members of the conspiracy, Ogorodnychuk stated, "I was just a hired hand pretty much," but that he and Chugay "pretty much have an equal relationship as far as the work is concerned, but personally I think [Chugay and Morgunov] were more involved." Chugay reported to Oliynik and Yurchyk, and Ogorodnychuk reported to Chugay.  Chugay "was the one making all the decisions directly" and "was more of a main guy" in the conspiracy than Morgunov.  Although other members of the conspiracy who lived in Ukraine predominately reported to Oliynik and Yurchyk, they also reported to Chugay.  Chugay and Morgunov handled the banking for the labor staffing companies and were in charge of wiring money to conspirators in Ukraine.  Co-conspirators paid others to open Paradise Choice and Tropical City Services in their names, but the named owners were not involved in running the company. Chugay directed Ogorodnychuk to sign documents as the named owner of the company.

In October 2020, Morgunov received a call from Homeland Security Investigations ("HSI") requesting an interview, but Oliynyk, Yurchyk, and Chugay decided to send Ogorodnychuk because he did not speak English well, and therefore, the agents

would be unable to extract information from him. He sat for an interview with HSI in 2020 and lied to the government. When asked why he lied, Ogorodnychuk responded that, before the interview, "they were kind of preparing me and they just told me say this, this and that, but all that was not true." He stated that, after the interview, the first thing he did was meet with Chugay. He later spoke with Oliynik and Yurchyk, who suggested that he leave the country, and he believed that they wanted him to leave because "they might have thought that I may tell something wrong about their business." When asked whether Chugay, Oliynik, or Yurchyk gave him any compensation after that, he responded that "they" paid for his and his family's tickets to Ukraine and sent other money to his family on a few occasions. When asked whether he understood that Oliynik, Yurchyk, and Chugay were paying him to stay out of the United States, he responded, that yes, they were paying him, but it was his decision to come back.

Dmytro Abamov, who formerly worked for a labor staffing company, testified that, when the government investigation into the labor staffing trade went public in 2021, all of the illegal labor companies in the Key West area shut down, but Chugay continued to operate. The government introduced audio messages from Chugay to Abamov, in which he stated, "over the past 3 months, 90% of contractors have left the business. Only we are left. . . . [W]e will not take them all. We specifically leave people overboard so that they run there and create panic." Abamov was surprised that Chugay was still operating his business despite having notice of an ongoing criminal investigation.

The government called Rodrigo Alvarez, a former worker for the labor staffing companies.  He testified that Chugay sent him a voice message in July 2021, in the midst of the investigation, in which he stated, "if someone ever will contact you by phone . . . do not respond, do not call them back, and better do not pick up the phone on unknown numbers . . . this way they cannot get in touch with you."  In another voice message to Alvarez, Chugay assured the worker that he would not get in trouble for failing to pay taxes, telling him, "if you did not have work authorization, you did not have official way to pay taxes.  So you're fine."  Chugay also stated in a voice message about the investigation, "I told her not to worry . . . she doesn't have to answer yet . . . [she] should write down the number too and not answer it."

Maryna Kulichenko, who was a worker for Paradise Choice, formerly placed at Duval House, testified.  The government published an invoice from Paradise Choice to Duval House, which reflected that Paradise Choice charged Duval House $16.25 per hour for Kulichenko's services.  Kulichenko testified that she took home $15 per hour, and the remaining $1.25 was Paradise Choice's fee.  They did not withhold any taxes, and the invoice did not reflect any taxes withheld.

The government called Marina Coppens, C.P.A., who testified to the following.  She began providing services to Chugay in 2016 or 2017, including filing corporate and personal tax returns for him, providing 1099 Forms, and filing corporate incorporation documents.  Chugay asked her to prepare the corporation paperwork

for Tropical City Services, which listed Vladyslav Brovko as the manager. Coppens interacted with Chugay when preparing business returns for Tropical City Services and did not remember meeting Brovko. Although an Internal Revenue Service ("IRS") letter assigning a tax identification number to Tropical City Services listed Brovko as the responsible party, the phone number listed matched Chugay's phone number.

The government called Allison Kotsay, a custodian of records for the IRS. The government submitted tax records from General Labor Solutions, Liberty Specialty Service, Paradise Choice, Paradise Choice Cleaning, Tropical City Group, and Tropical City Services. Kotsay testified that the records indicated that the labor staffing companies did not pay employment taxes for the years with available records. Kotsay also testified that Paradise Choice Cleaning filed false tax returns. The records also revealed that Paradise Choice Cleaning issued 38 Forms 1099 between 2016 and 2020, and Tropical City Services issued 2 Forms 1099 between 2017 and 2020. Between 2016 and 2020, Paradise Choice and Tropical City Group did not issue any Forms 1099.

The government introduced two sworn affidavits and deposition testimony prepared by Chugay for a civil case. In his initial affidavit, Chugay stated that many of the contract workers Paradise Choice Cleaning provided to work for a Key West hotel were not lawfully permitted to work in the United States, and that the company did not check the workers' legal status. He also stated that they did not withhold FICA, Medicare, and federal withholding

taxes as required by law for the contract workers, and did not request or complete pre-employment forms, but provided Forms 1099 upon request. In his subsequent affidavit, Chugay stated, "I mistakenly stated that 'many' of the contract workers my company provided . . . were not lawfully permitted to work in the United States. . . . I do not know the statement. . . of the Prior Affidavit to be true."

Jon Thibodeaux, an IRS agent employed in the office of fraud enforcement, testified to the following regarding employment taxes. Federal Insurance Contribution Act ("FICA") taxes required employers to withhold Medicare and Social Security taxes (collectively "FICA taxes") from employee's wages, the Internal Revenue Code required employers to withhold federal income taxes from employee's wages, and FICA required employers to pay a portion of FICA taxes to the IRS. Employers of subcontractors were responsible for providing and filing an IRS Form 1099, regardless of whether the worker requested the form.

Thibodeaux further testified to the tax loss caused by the conspiracy. To calculate the tax loss, he reviewed payroll records and tax calculations contained in QuickBooks records from Chugay's and Yurchyk's computers. To analyze the payroll records, Thibodeaux sorted the information by name of payee and the dates to determine the amount of tax owed for each year. The government submitted a spreadsheet of Thibodeaux's calculations of unpaid FICA taxes. The spreadsheet revealed that records were available from 2008 to 2014 and from 2020 to 2021. Thibodeaux

testified that he did not receive records for 2015 to 2019 and that the records for 2013, 2014, and 2020 were missing data for some quarters. The available records reflected payments totaling $73,264,477.62 to a total of 9,561 unique individuals. Thibodeaux calculated 15.3 percent—the total FICA tax rate—of the total sum of payments to determine that the conspiracy caused a FICA tax loss of $10,863,233.05 from 2008 to 2014, and 2020 and 2021. Thibodeaux noted that, because his calculation excluded the years and quarters with missing records and excluded federal income tax, his estimate was a substantial understatement of the total tax loss to the United States caused by the conspiracy.

And the government submitted a summary of bank transactions in excess of $10,000, which revealed that the co-conspirators laundered over $11 million between 2009 and 2021.

At the end of the seven-day trial, the jury found Chugay guilty on all three counts.

Prior to sentencing, the U.S. Probation Office generated Chugay's presentence investigation report ("PSI"). The PSI reported that, according to the government, from at least 2008 through 2021, Chugay, Oliynyk, Yurchyk, and Morgunov were responsible for a tax loss to the United States of over $25 million. The PSI reported that the estimate was based on incomplete Quick-Books records seized pursuant to search warrants and was based on tax loss from records for the years 2008 to 2014, 2020, and 2021.

The PSI stated that Chugay encouraged others to violate the tax law because his conduct encouraged workers not to pay taxes

by failing to withhold employment taxes, by not reporting the workers' wagers to the IRS, and by not providing the workers with annual tax forms.  It purported that Chugay's businesses also encouraged their hospitality business customers not to pay taxes for the workers by providing a means to employ people off the hospitality businesses' payroll.

In October 2020, Ogorodnychuk appeared for a voluntary interview with agents, during which he made several false statements.  According to the government, Chugay, Oliynyk, and Yurchyk instructed Ogorodnychuk to lie to federal investigators and then instructed him to leave the country.  Once he fled, Chugay, Oliynyk, and Yurchyk paid Ogorodnychuk to stay in Ukraine.  Chugay encouraged others not to cooperate with the investigation by telling others not to speak with or respond to calls or messages from federal agents.  Notably, while under criminal investigation, competing illegal labor staffing companies in the Key West area shut down, but Chugay and the Oliynyk Crew saw this as an opportunity to expand their business and increase profits.

The PSI grouped Counts 1 and 2 pursuant to U.S.S.G. § 3D1.2(b), grouped those counts with Count 3, pursuant to § 3D1.2(d), and then calculated the offense level based on the most serious of the counts comprising the group.  The PSI calculated a base offense level of 28 in accordance with U.S.S.G. § 2T1.4.  The PSI then applied: (1) a two-level increase, pursuant to U.S.S.G. § 2T1.1(b)(1), because Chugay failed to report or correctly identify the source of income exceeding $10,000 in any year; (2) a two-level

increase, pursuant to § 2T1.1(b)(2), because the offense involved sophisticated means; (3) a two-level enhancement, pursuant to U.S.S.G. § 2T1.9(b)(2), because the offense conduct was intended to encourage others to violate the internal revenue laws; (4) a four-level adjustment, pursuant to U.S.S.G. § 3B1.1(a), because Chugay was an organizer or leader of a criminal activity that involved five or more participants; and (5) a two-level adjustment, pursuant to U.S.S.G. § 3C1.1, because Chugay willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice. These enhancements resulted in a total adjusted offense level of 40.

Chugay had no criminal convictions, so probation computed a criminal history score of 0, and a criminal history category of I. Based on his total offense level and criminal history category, probation calculated a total guideline range of 292 to 365 months' imprisonment.

Chugay filed objections to the PSI. In relevant part, Chugay overall objected to the statement of facts, asserting that the facts were not taken from the trial transcripts, and objected to specific facts contained in it. Chugay objected to the four-level enhancement, pursuant to § 3B1.1(a), for his role as an organizer or leader of the conspiracy, on the grounds that the trial testimony supported that he was below others in the hierarchy. He also objected to the two-level enhancement, pursuant to § 3C1.1, for obstruction of justice, arguing that he merely informed others that they were not required by law to volunteer information, that he did not tell Ogorodnychuk to flee, and that Ogorodnychuk's testimony at trial

did not specify that Chugay told him to lie to agents. Chugay next objected to the two-level adjustment, pursuant to § 2T1.9(b)(2), for encouraging others to violate the internal revenue laws. He contended that the testimony at trial showed that he did not actively encourage others or promote the scheme to other taxpayers. Finally, Chugay objected to the PSI's loss amount calculation of $25 million. He asserted that the number was based on estimation, that only $10 million was proven at trial, and that the calculation included the failure of employees to pay taxes on their wages. The government opposed Chugay's objections.

The parties also filed sentencing memoranda. In relevant part, Chugay argued that 18 U.S.C. § 3553(a)(6) requires that courts consider the sentences of similarly situated defendants. He contended that the average sentence under § 2T1.1 with a minimum loss of $25 million was 112.5 months imprisonment, and the median sentence was 108.5 months. He compared these numbers to the recommended guideline range in his own case of 292 to 365 months' imprisonment, arguing that the range was an outlier and not reflective of the crimes. The government responded that the Guidelines were specifically designed to reduce disparity in sentencing for tax offenses, and argued that Chugay's "multidimensional and brazen conduct" warranted a sentence of 336 months' imprisonment. It asserted that such a sentence was appropriate in light of Ogorodnychuk's sentencing, given that (1) Chugay was involved in the conspiracy for much longer and resulted in a substantially higher tax loss than Ogorodnychuk, and (2) Ogorodnychuk accepted responsibility and cooperated by testifying at Chugay's

trial.  It argued that average tax cases had lower sentences because those cases did not involve the same level of aggravating conduct as the instant case.

At sentencing, the district court stated that it had reviewed the defense objections to the PSI, the government's response to the objections, and both parties' sentencing memoranda.  The district court denied Chugay's objections, explaining that it remembered the trial "very well" and the facts of the case as they were presented, and believed that the objections were not well-founded. Chugay argued that an offense level of 40 in a tax fraud case with a loss of $25 million was unprecedented and that his guideline range was higher than the sentences received in the district's most notorious fraud cases.  The district court responded that it considered the guideline range to be appropriate, articulating, "I don't think it's the amount of dollars; it is the flaunting of the rules over and over again, 9,000 times . . . . [T]his is not your normal tax evasion case, and it shouldn't be treated as the normal tax evasion case." The district court stated that it had considered the statements of all parties, the PSI and advisory guidelines, and the 18 U.S.C. § 3553(a) statutory factors.  The district court then stated:

> I will point out that the violations in this case were not only long-term and not only involved a tremendous number of people who also became subject to violations of the law and subject to prosecution for violating the law, but that when others in the Key West area got out of the business because the word got out that it was being investigated, Mr. Chugay

and his partners took that as an opportunity to expand, and expanded their business and took over all of the people that were going out of business.

The district court imposed a total sentence of 292 months' imprisonment, consisting of 52 months as to Counts 1 and 3, to run concurrently with each other, and 240 months as to Count 2, to run consecutively to Counts 1 and 3. Chugay objected to the court's findings of fact and the manner in which the sentence was pronounced, stating, "[w]e believe in our presentence report we have cited trial testimony which contradicts the facts in the presentence report which the Court adopted, and we object to the sentence for the reasons previously stated."

This timely appeal followed.

## II.

When reviewing the district court's findings with respect to Sentencing Guidelines issues, we consider legal issues *de novo*, factual findings for clear error, and the court's application of the Guidelines to the facts with due deference, which is akin to clear error review. *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010). The district court's imposition of an aggravating role enhancement is a factual finding that we review for clear error. *United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018). To be clearly erroneous, the finding of the district court must leave us with a "definite and firm conviction that a mistake has been committed." *Rothenberg*, 610 F.3d at 624 (quoting *United States v. Rodriguez-Lopez*, 363 F.3d 1134, 1136–37 (11th Cir. 2004)). Further,

"[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Smith*, 821 F.3d 1293, 1302 (11th Cir. 2016) (alteration in original) (quoting *Anderson v. City of Bessemer City*, 821 F.3d 1293, 1302 (11th Cir. 2016)).

"When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing 'sufficient and reliable' evidence to prove the necessary facts by a preponderance of the evidence." *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) (quoting *United States v. Perez-Oliveros*, 479 F.3d 779, 783 (11th Cir. 2007)). The district court's factual findings for sentencing purposes may be based on evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing. *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004).

The Guidelines prescribe a four-level enhancement for a defendant who was an organizer or leader of a criminal activity that involved either (1) five or more participants or (2) was otherwise extensive. U.S.S.G. § 3B1.1(a). We examine whether a defendant was an organizer or leader, as compared to a manager or supervisor, by considering the following seven factors:

> (1) [the] exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the

illegal activity, and (7) the degree of control and au-
thority exercised over others.

*United States v. Martinez*, 584 F.3d 1022, 1026 (11th Cir. 2009) (quot-
ing *United States v. Gupta*, 463 F.3d 1182, 1198 (11th Cir. 2006)); *ac-
cord* U.S.S.G. § 3B1.1 cmt. n.4.  There is no requirement that all of
these factors be present for the enhancement to apply, and there
may be more than one person who qualifies as a leader.  *United
States v. Dixon*, 901 F.3d 1322, 1348 (11th Cir. 2018).  "To qualify for
an adjustment under this section, the defendant must have been
the organizer, leader, manager, or supervisor of one or more other
participants."  U.S.S.G. § 3B1.1 cmt. n.2.

"[S]ection 3B1.1 requires the exercise of some authority in
the organization, the exertion of some degree of control, influence,
or leadership."  *Martinez*, 584 F.3d at 1026 (quoting *Gupta*, 463 F.3d
at 1198).  Thus, the district court should determine whether the
facts that the government proves establish, standing alone or in
concert, at least one of the seven factors.  *See id.* at 1027–28.  The
Guidelines have clarified that "titles such as 'kingpin' or 'boss' are
not controlling" when deciding whether a defendant is a leader or
organizer rather than a supervisor or manager.  § 3B1.1 cmt. n.4.
In many cases in which we have affirmed the district court's appli-
cation of the four-level enhancement, "there was evidence that the
defendant had recruited participants, had instructed participants, or
had wielded decision-making authority."  *Shabazz*, 887 F.3d at 1222
(quoting *United States v. Caraballo*, 595 F.3d 1214, 1231 (11th Cir.
2010)).

Here, we conclude that the district court did not clearly err in applying the enhancement for Chugay's role as a leader or organizer in the offense. As discussed above, the evidence at trial established that Chugay exercised decision-making authority, was a significant participant in the commission of the offense, was directly involved in planning and organizing the scheme, and exercised control and authority over others. *See Martinez*, 584 F.3d at 1026. Further, the nature and scope of the illegal activity was extensive, involving over 9,000 participants and spanning over a decade. And while Ogorodnychuk's testimony indicated that Chugay and Morgunov had similar roles in the conspiracy, Morgunov's role does not impact Chugay's designation because there can be more than one leader of a conspiracy. *See Dixon*, 901 F.3d at 1348.

Thus, the trial evidence established multiple factors and sufficient evidence supports the court's determination that Chugay was an organizer or leader. Accordingly, we affirm as to this issue.

## III.

When reviewing a court's imposition of an adjustment for obstruction of justice, we review the district court's factual findings for clear error. *United States v. Guevara*, 894 F.3d 1301, 1311 (11th Cir. 2018). Pursuant to U.S.S.G. § 3C1.1, a defendant's offense level is increased by two levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of

conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

A defendant's intent to obstruct justice, or the potential that his conduct may have evaded investigation or prosecution, is not enough to support the adjustment. *United States v. Banks*, 347 F.3d 1266, 1270 (11th Cir. 2003). Instead, the government must provide evidence that the defendant's conduct "'actually resulted' in a hinderance." *Id.* (quoting U.S.S.G. § 3C1.1 cmt. n.5(A)). Obstruction of justice generally includes willfully "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. n.4(A). The commentary does not define "unlawful influence," but we have held that it includes urging a potential witness to lie to the police. *United States v. Amedeo*, 370 F.3d 1305, 1318–19 (11th Cir. 2004). We have upheld the application of the enhancement where a conspirator urged and financially aided a co-conspirator to flee from law enforcement authorities for the purpose of obstructing law enforcement's access to potentially incriminating evidence. *United States v. Rudisill*, 187 F.3d 1260, 1264 (11th Cir. 1999). We have also upheld the application of the enhancement when the defendant brought a potential witness contacted by federal agents into a walk-in freezer, asked him not to speak with federal agents, and told him to falsely advise federal agents that he knew nothing of the offense. *United States v. Garcia*, 13 F.3d 1464, 1471 (11th Cir. 1994).

The district court did not clearly err in applying an obstruction of justice enhancement based on the finding that Chugay and his co-conspirators instructed Ogorodnychuk to attend the HSI interview intended for Morgunov and lie to investigators, and encouraged and aided him to flee the United States. Although there were multiple permissible views of Ogorodnychuk's testimony, the district court was permitted to view the evidence as proof that Chugay encouraged and paid Ogorodnychuk to leave the country and remain abroad, and this choice cannot be clear error. Accordingly, we affirm as to this issue.

## IV.

The Guidelines provide for a two-level increase if "conduct was intended to encourage persons other than or in addition to co-conspirators to violate the internal revenue laws or impede, impair, obstruct, or defeat the ascertainment, computation, assessment, or collection of revenue." U.S.S.G. § 2T1.9(b)(2). The enhancement applies "where the conduct was intended to encourage persons, other than the participants directly involved in the offense, to violate the tax laws (e.g., an offense involving a 'tax protest' group . . . or an offense involving the marketing of fraudulent tax shelters or schemes)." *Id.* cmt n.4.

The district court did not clearly err in applying an enhancement for encouraging others to violate the internal revenue laws. The evidence establishes that Chugay provided a means by which his hospitality workers could avoid paying taxes and impeded the ascertainment and collection of revenue by providing Forms 1099

to workers only upon request and assuring workers that they would not face penalties for failing to pay their taxes. Accordingly, we affirm as to this issue.

## V.

We review the district court's determination of the loss amount for clear error. *United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015). The government has the burden of proving the losses attributed to the defendant by a preponderance of the evidence. *Id.* The Guidelines do not require that the sentencing court make a precise determination of loss. *Id.* Instead, "a sentencing court need only make a reasonable estimate of the loss, given the available information." *Id.* (alteration adopted) (quoting *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011)). The Guidelines state that loss is calculated as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Intended loss" is the pecuniary harm that was intended to result from the offense. *Id.* cmt. n.3(A)(ii). "Actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). The district court is in a unique position to assess the relevant evidence and estimate the loss, and we thus grant the sentencing court's loss amount determination "the appropriate deference." *Cavallo*, 790 F.3d at 1232 (quoting § 2B1.1 cmt. n.3(C)).

All relevant conduct may be considered in determining the loss amount, including any acquitted conduct, as long as the government can prove the conduct by a preponderance of the evidence. *Id.* at 1233–34. The district court may hold all participants

in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy. *See id* at 1235. When the defendant challenges the loss amount calculation, the government must support it "with reliable and specific evidence." *United States v. Wilson*, 788 F.3d 1298, 1318 (11th Cir. 2015). For example, we concluded that the district court committed reversible error where it made no specific factual findings on which to base the loss amount, and instead, stated that it just "pick[ed] a figure, like any jury would, about halfway in between" the parties' loss estimates. *United States v. Gupta*, 572 F.3d 878, 889 (11th Cir. 2009). But the sentencing court's failure to make specific factual findings as to loss amount "will not result in reversal 'if the record otherwise supports the court's determinations.'" *United States v. Maitre*, 898 F.3d 1151, 1160 (11th Cir. 2018) (alteration adopted) (quoting *United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014)).

We conclude that the district court did not clearly err in holding Chugay accountable for a loss amount of $25 million. Although the court did not make individualized findings at sentencing, the record supports the court's determination. For example, as recounted above, Thibodeaux testified that the $10 million loss estimate given at trial was an incomplete number and a substantial understatement of the total tax loss to the United States considering that several years of records were unavailable, and the estimate only included FICA taxes. Additionally, in response to Chugay's objections to the PSI, the government filed an explanation of the

$25 million figure, walked through the calculations, and cited additional methodologies that yielded a figure greater than $25 million.

Thus, the government provided sufficiently reliable and specific evidence in its response to Chugay's objections for the court to find Chugay responsible for $25 million in losses by a preponderance of the evidence.  Accordingly, we affirm as to this issue.

## VI.

We review the reasonableness of a sentence under a deferential abuse-of-discretion standard.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  The party challenging the sentence bears the burden of establishing that it is unreasonable based on the facts of the case and the 18 U.S.C. § 3553(a) factors.  *Shabazz*, 887 F.3d at 1224.  Typically, we review for plain error procedural sentencing issues raised for the first time on appeal.  *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014).  But we review a district court's failure to adequately explain a sentence *de novo*, even if the defendant did not object below.  *United States v. Cabezas-Montano*, 949 F.3d 567, 608 n.39 (11th Cir. 2020).

In reviewing the reasonableness of a sentence, we first consider whether the district court committed a procedural error.  *Gall*, 552 U.S. at 51.  A district court commits a procedural sentencing error when it imposes a sentence based on clearly erroneous facts, fails to calculate or improperly calculates the guideline range, fails to consider the § 3553(a) factors, treats the Guidelines as mandatory, or fails to explain the chosen sentence.  *Id.*  While the district court must consider the § 3553(a) factors, it need not state on

the record that it has explicitly considered each of the factors or to discuss each of them. *United States v. Kuhlman*, 711 F.3d 1321, 1326 (11th Cir. 2013). Instead, an acknowledgment by the district court that it considered the factors is sufficient. *United States v. Turner*, 474 F.3d 1265, 1281 (11th Cir. 2007).

After ensuring that a sentence is procedurally sound, we then consider the substantive reasonableness of a sentence. *Gall*, 552 U.S. at 51. The district court must impose a sentence that is "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with any needed correctional treatment or training. § 3553(a)(2). It must also consider the nature and circumstances of the offense, the defendant's history and characteristics, the kinds of sentences available, the applicable guidelines range, any pertinent policy statements, and the need to avoid sentencing disparities between similarly-situated defendants. § 3553(a)(1), (3)–(7).

The weight given to each factor lies within the district court's sound discretion, and it may reasonably attach great weight to a single factor. *Kuhlman*, 711 F.3d at 1327. Still, a district court abuses its discretion if it "(1) fails to afford consideration to relevant factors that were due significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (quoting *United States*

*v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (en banc)). Although we do not automatically presume that a sentence within the guidelines range is reasonable, we ordinarily expect such a sentence to be reasonable. *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008).

"[D]isparity between the sentences imposed on codefendants is generally not an appropriate basis for relief on appeal." *Cavallo*, 790 F.3d at 1237 (quoting *United States v. Regueiro*, 240 F.3d 1321, 1325–26 (11th Cir. 2001)). When considering a claim of disparity, we first consider "whether the defendant is similarly situated to the defendants to whom he compares himself." *United States v. Duperval*, 777 F.3d 1324, 1338 (11th Cir. 2015). For example, "for purposes of § 3553(a)(6), a defendant who cooperates with the Government and pleads guilty is not 'similarly situated' to his co-defendant who proceeds to trial," and "there is no unwarranted disparity even when a cooperating defendant receives a 'substantially shorter' sentence than a defendant who goes to trial." *Cavallo*, 790 F.3d at 1237 (citation omitted) (quoting *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009)). We have held that evaluating alleged disparities requires "more than the crime of conviction and the total length of the sentences." *United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015).

We have indicated that the defendant's arguments about unwarranted disparity should be specific enough for it to "gauge." *United States v. Hill*, 643 F.3d 807, 885 (11th Cir. 2011) (noting that the defendant's argument that there was an unwarranted disparity

between his sentence and others who have been convicted of fraud crimes throughout the country "would be difficult to gauge"). Relying on *Gall*, we stated that the "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," and because the district court "correctly calculated and carefully reviewed the Guidelines range," the court "necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Id.* (quoting *Gall*, 552 U.S. at 54).

We conclude that Chugay's sentence is procedurally reasonable because the district court considered the § 3553(a) factors and explained the chosen sentence. The court articulated its balancing with imposing Chugay's sentence, noting that "it is the flaunting of the rules over and over again, 9,000 times" and that "this is not your normal tax evasion case, and it should not be treated as the normal tax evasion case." It also explained that the sentence was appropriate given the long-term violations, which involved a "tremendous number of people who also became subject to violations of the law and subject to prosecution for violating the law," and given that Chugay and his co-conspirators expanded when competitors under investigation went out of business.

We also conclude that Chugay's sentence is substantively reasonable. The district court gave significant weight and consideration to the need to avoid unwarranted sentencing disparities when it correctly calculated and reviewed the Guidelines range, and it was permitted to attach greater weight to the seriousness of

the offense conduct.  Chugay's argument to the contrary fails to take into consideration that the aggravating circumstances of this case, which resulted in multiple enhancements, suggest that he is not similarly situated to the average tax fraud perpetrator, regardless of loss amount.  Again, the district court stated that "this is not your normal tax evasion case, and it should not be treated as the normal tax evasion case."  Further, Chugay's sentence was within the Guidelines range.  *See Hunt*, 526 F.3d at 746.  We thus affirm as to this issue.

## VII.

For all these reasons, we affirm Chugay's sentence.

**AFFIRMED.**